IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

AKIL CARTER, et al.,

    Plaintiffs,

v.                                          CASE NO. 19CV1422-JPS

CITY OF WAUWATOSA, et al.,

    Defendants.

## PARTIES' JOINT STATEMENT OF MATERIAL FACTS FOR SUMMARY JUDGMENT

Defendant City of Wauwatosa is a Wisconsin municipal corporation whose principal offices are in Wauwatosa, Wisconsin. (ECF No. 1-2, Complaint, ¶ 7) At all relevant times, Defendant Barry Weber was the Chief of Police for the City of Wauwatosa (ECF 93, ¶ 1); Defendant Patrick Kaine was a police officer with the City of Wauwatosa Police Department (ECF No. 78-2, 8:3-5); Defendant Luke Vetter was a police Lieutenant with the City of Wauwatosa Police Department (ECF No. 92, ¶ 10); Defendant Nicole Gabriel was a police officer with the City of Wauwatosa Police Department (ECF No. 94-4, 6:9-14); and Defendant Derek Dienhart was a police officer with the City of Wauwatosa Police Department. (ECF No. 59-1, 9:16-21)

On September 2, 2018, Ms. Adams was driving a blue Lexus vehicle with Ms. Barr riding in the front passenger seat and Mr. Carter riding in the back seat. (ECF No. 1-2, ¶¶ 27, 30; ECF No. 93-4) Mr. Carter is the grandson of Ms. Barr. (ECF No. 1-2, ¶ 30; ECF No. 93-4) Ms. Adams and Ms. Barr are Caucasian. (ECF No. 1-2, ¶ 26; ECF No. 93-5) Mr. Carter is African American. (ECF No. 1-2, ¶ 30; ECF No. 93-5)

Officer Kaine and Carl Anderson have testified that, on September 2, 2018, at approximately 11:50 a.m., Anderson made contact with Officer Kaine who was in a marked Wauwatosa Police Department squad parked near North 106th Street and West Burleigh Street. (ECF No. 58-2, 34-35; ECF No. 78-2, 45:5—46:22) Anderson and Kaine testified that Anderson reported to Officer Kaine, he saw what he believed to be "a possible robbery that's taking place in that blue Lexus that's going westbound on Burleigh." (ECF No. 58-2, 35 42; ECF No. 78-2, 45:5—46:22) Officer Kaine testified that Anderson was speaking in an excited manner. (ECF No. 78-2, 46:16-22) Anderson also testified that he told Defendant Kaine that he saw something in Mr. Carter's hand which he described as follows:

> A. I said it was a long black object in his hand, it may be a gun. It looked like a gun.
> Q. But it wasn't longer than this iPhone?
> A. I didn't see-I only saw maybe about two or three inches of it because the right hand was—his right hand was over her left shoulder.

The iPhone shown to Mr. Anderson during his deposition was an iPhone X. (ECF No. 58-2, 42)

Officer Kaine then notified dispatch: "I just got flagged down at Mayfair and Burleigh that there is an individual robbing two females in a blue Lexus." (ECF No. 94-1 at 0:00-0:20) Dispatch assigned Officers Gabriel and Dienhart to assist with the traffic stop. Lieutenant Luke Vetter was also near the area and heard Officer Kaine radio regarding the robbery complaint and responded to assist. (ECF No. 92, ¶¶ 2-5; ECF No. 94-2)

Officer Kaine also radioed dispatch to send someone to try to locate the citizen who flagged him down and provided the following information: "the citizen who flagged me down maybe either behind me or over at 107th and Burleigh" vehicle is "blue chevy" containing a "black male driver" and "another person in the passenger seat." (ECF No. 94-1 at 1:55-2:12; ECF No. 93-5 at 01:19 - 01:32) Police Officer Julie Gibbs went to the surrounding area of North 106th Street and West Burleigh Street but did not locate the vehicle or the complainant that had flagged Officer Kaine down. (ECF No. 92, ¶¶ 6, 24)

Once traffic started to proceed westbound with the green light Officer Kaine observed a blue Lexus, 2011, ES350, 4 door, Wisconsin plate number 212-GJZ, traveling westbound through the intersection. There were no other blue Lexus cars in the intersection. (ECF No. 93-5 at 00:01-00:56; ECF No. 78-2, 50:3-13) Officer Kaine proceeded westbound following the blue Lexus and observed that there was at least one person in the back seat and two people sitting in the front seats, but he could not distinguish any race until the car was stopped. (ECF No. 93-5 at 00:01-04:45; ECF No.78-2 at 53:14-24) While following the Lexus, Officer Kaine did not observe the driver violate any traffic law. (ECF No. 78-2, 55:9-20) Kaine testified as follows regarding following the Lexus:

> Q. Okay. As you're following this Lexus, what if anything do you observe the people in the car do?
> A. Nothing jumps out at me that they're doing this or that. They're just driving along, as far as I can tell.
> Q. They're going the speed limit or below the speed limit~
> A. From recollection, yes.
> Q. They're staying in the lane and not driving erratically, correct?
> A. Not that I can recall.
> Q. Do you see any people in the car make any furtive movements?
> A. No.
> Q. Other than the statement of the person in the blue Chevrolet, do you have any reason to believe that there is a violation of any kind occurring with this Lexus?
> A. No. No.

(*Id.* at 55:4-20)

Officer Kaine then turned on his lights and initiated a traffic stop of the blue Lexus in the 11400 block of West Burleigh Street. (ECF No. 78-2, 54: 2-5, ECF No. 93-5 at 0:45-01:00) The blue Lexus pulled over at 11:51:00 a.m. (ECF No. 93-5 at 0:45 - 01:00) Officer Kaine waited for other officers to arrive and did not approach the vehicle. (ECF No. 78-2, 56:23—57:5) While waiting for back-up, Officer Kaine made verbal contact with the occupants of the blue Lexus through the PA and instructed "everybody put up their hands in the car." (ECF No. 93-5 at 01:42-01:54)

Lt. Vetter was the second to arrive on the scene. Lt. Vetter believed he was responding to "a robbery occurring inside a blue vehicle." Upon arriving on the scene, he observed the stopped blue Lexus with two women in the front seat and one male in the back seat. Lt. Vetter also observed Officer Kaine standing outside of his squad car behind the open driver's side door for "some cover and safety." (ECF No. 92, ¶¶ 7-8; ECF No. 94-3, 32-33) Lt. Vetter approached Officer Kaine and the two formulated a plan. (ECF No. 92 ¶ 9; ECF No. 78-2, 34-36; ECF No. 93-5 at 04:41-05:06)

Once back-up arrived, Officer Kaine ordered, "Person in the back seat. I need you to step out of the car with your hands up, facing away from us. Do you understand?" (ECF No. 92, ¶ 11; ECF No. 93-5 at 05:10) The rear passenger side door then opened and a person, who was later identified as Carter, exited, and walked backwards toward the officers, as instructed. (ECF No. 93-5 at 05:20-05:59) Carter was ordered to his knees. (ECF No. 92, ¶ 13; ECF No. 94-3, 41:5-6; ECF No. 93-5 at 05:58) Carter was placed in handcuffs by Lt. Vetter to detain him in order to further investigate the robbery complaint. Carter was also patted down for weapons. Carter was not armed. Carter remained calm and respectful throughout. (ECF No. 92, ¶¶ 14-17, 21; ECF No. 94-8, at 01:07-01:17)

Officer Dienhart heard Officer Kaine's dispatch communication and was dispatched to the area near 114th Street and West Burleigh Street to assist. He was the third officer on the scene and parked to the left of Officer Kaine's vehicle. (ECF No. 59-1, 24:21-24; ECF No. 91, ¶¶ 2-3; ECF No. 94-7) Officer Dienhart believed he was responding to a high-risk traffic stop. (ECF No. 91, ¶5) When Officer Dienhart arrived on the scene, he observed both Officer Kaine and Lt. Vetter outside of their squads ordering a subject to walk backwards toward their vehicles. The subject had his arms up. (ECF No. 91, ¶ 4; ECF No. 94-7) Officer Dienhart believed his role upon arrival was a cover officer. Accordingly, Officer Dienhart got his rifle, exited his squad, and pointed the rifle at "a low ready position basically covering" the driver's side of the vehicle. (ECF No. 91, ¶ 6, ECF No. 59-1, 24:3—25: 13) In the low ready position it was "not pointed at an individual or at the vehicle directly." (ECF No. 59-1, 26:14-15) Officer Dienhart's rifle was an AR-15 and he charged the AR-15. (ECF No. 59-1, 25:13-18) Once Officer Dienhart realized that "maybe this isn't what it was initially reported as" he "brought the gun down and had it pointed straight down at the ground." (*Id.* at 29:19-24) Officer Dienhart was on the scene for approximately 4 minutes. (ECF No. 91, ¶¶ 8-11; ECF No. 94-7 at 00:45-4:43)

Officer Nicole Gabriel was the fourth officer to arrive on the scene and her role was as an assisting officer. (ECF No. 94-4, 13; ECF No. 94-8 at 00:43) Officer Gabriel believed she was responding to a robbery, and when she arrived on-scene she observed the other officers had a subject detained. Lt. Vetter then escorted Carter to the back of Officer Kaine's squad car, where Carter was seated and turned over to Officer Gabriel until the investigation could be completed. (ECF No. 92, ¶ 21; ECF No. 94-8 at 01:07-03:04 ECF No. 94-4, 13-16; ECF No. 94-8 at 00:43-06:14; ECF No. 93-4 at 08:42-10:55)

Once Carter was secured, Officer Kaine holstered his gun and approached the vehicle. (ECF No. 93-5 at 7:04; ECF No. 94-8 at 00:41-00:43) Officer Kaine never pointed his service weapon at Mr. Carter or at the occupants of the vehicle. (ECF No. 78-2, 58:18—59:22) When Kaine's service weapon was unholstered it was pointed "down to the side." (ECF No. 78-2, 58:18-24) When asked why he made the decision to carry his weapon unholstered and down Defendant Kaine testified, "[b]y the time I stopped the car, to that point, based on the behaviors of the driver of the blue Lexus and his grandmother who was in in the front passenger seat, I didn't get the feeling that they were the victims of a robbery in progress, which is what I was told..." (ECF No. 78-2, 59:7-22)

Officer Kaine spoke with the front seat passenger, Barr, and the driver, Adams. Barr told Officer Kaine that Carter was her grandson and there was no robbery. Officer Kaine then apologized multiple times and said that Carter was going to be released. (ECF No. 93-5 at 06:33-10:50) Officer Gabriel further explained the situation to Carter and apologized for the misunderstanding. (ECF No. 94-4,13-16; ECF No. 93-5 at 08:42-10:55)

Once it was determined that the complaint was unfounded and that there was no robbery in progress, the handcuffs were removed, and Carter was released. (ECF No. 93-5 at 11:08) Carter was in handcuffs for approximately five minutes. (ECF No. 93-5 at 11:05) Carter was in the back of the squad car for approximately 2 minutes with the squad door open. (ECF No. 93-5 at 08:40-10:56) The total time between Officer Kaine initiating the traffic stop and Plaintiffs being released from the scene was approximately eleven minutes. (ECF No. 93-5 at 00:55-12:35) Officer Gabriel was on scene with Plaintiffs for approximately 6 minutes. (ECF No. 94-8 at 00:43-06:58) While on scene, Officer Gabriel never unholstered her weapon. (ECF No. 94-8 at 00:43-06:58) Lt. Vetter never pointed his service weapon at Carter or any occupants of the vehicle. (ECF No. 92, ¶ 23)

The dispatch audio recording system recorded radio communications regarding the September 2, 2018 incident. (ECF No. 94-1) The audio video recording system from Officer Kaine's squad dash camera (ECF No. 93-5); Officer Dienhart's squad dash camera (ECF No. 94-7); and Officer Gabriel's squad dash camera (ECF No. 94-8) all captured portions of the incident on September 2, 2018. In addition, the audio video recording system from the back seat camera of Officer Kaine's squad car captured portions of the incident on September 2, 2018 (ECF No. 93-4) Kaine's assigned squad had video cameras that were able to face forward and behind. (ECF Nos. 93-5 and 93-4)

In his squad video, Kaine says to Mr. Carter at the 12:01:13 mark that there was a guy who told him there was a "black guy robbing two white ladies." (ECF No. 93-5) Defendant Kaine followed up that statement by telling Carter the witness was "he himself was the color of yourself." (ECF No. 93-5) Kaine is also heard telling Mr. Carter at the 12:01:45 mark, "it's not something I made up." (*Id.*) After Mr. Carter was released, Defendant Kaine is heard telling one of the other officers on scene at the 12:02:22 mark that the basis for the stop was he was told there was a "black dude robbing two white ladies." (*Id.*) In the immediate seconds, if not minutes, following the stop, Kaine is heard explaining his stop to his colleagues that he was told a single black male was "robbing" two white females. (*Id.*) An unidentified officer is heard on one of the squad videos saying, "I didn't know he was doing a high risk stop," to which an officer is heard replying, "kind of a medium one." (ECF No. 93-5)

Kaine's incident report, dated 09/04/18, states that the driver of a "newer blue passenger car (possibly a Chevrolet)" who was a "M/B in his 40's" told him that "two black guys" were robbing a white female driver in the blue Lexus. (ECF No. 78-2 at 46) Kaine's report quoted the language, "two black guys". (ECF No. 78-2 at 46) In his deposition, Kaine testified that he recalled the tipster telling him, "[t]hat there were two black guys in the back seat of a blue Lexus and that they were robbing a white lady." (ECF No. 78-2 at 48)

> When asked, "what was the plan that you and Officer Kaine formulated?" Vetter testified
>
> "I believe we were comfortable with ordering Mr. Carter out of the car just with us two conducting that contact with him. I think generally we had some concern that was the complaint given to us about this robbery, was it going to be legitimate or not. It's not uncommon for complaints to – once you start investigating them, for them not to be valid."

(ECF No. 94-3, 34:15-24) When asked "what in your mind is the difference between the three kinds of stops?" referencing felony stops, contact stops, and non-contact stops, Defendant Kaine testified:

> The non-contact stop is where you don't – you don't approach the vehicle, but you engage, you have the subject exit his vehicle, and you can have him stand by the rear of his car, and you can stand by your car, and you just have a conversation.
>
> Felony is a high risk stop. Generally speaking, you want to have at least four officers at the scene. You set up your cars like this angled at the suspect vehicle about 50 feet behind the suspect vehicle. That's basically the high risk stop where one officer would be giving directions to the people in the vehicle. Eventually. . . they order the subject out of the car, walk backwards towards the officers, hands in the air, order them back basically to the front of the two vehicles, and then, if you want to do a full felony stop or high risk stop, you can order them down to their knees or prone. . . to the ground. Then one officer would be the arresting officer. Place them in handcuffs, sit them up, bring them back.

(ECF No. 78-2, 22-24)

When asked "what does a high risk traffic stop look like versus a non-contact traffic stop, Vetter testified, "[t]here are going to be more squad cars, more officers. There will probably be a much higher level of force that's obvious, meaning weapons probably will be drawn and/or pointed at that vehicle and oftentimes loud commands being given, whether that's over a PA or just being hollered out at the car and occupants involved." (ECF No. 94-3, 24:25—25:7)

Training of police officers in Wisconsin is governed by state law. (ECF No. 93, ¶ 20) Wisconsin has established the Law Enforcement Standards Board to prescribe minimum e requirements for police officer training. (*Id.* at ¶ 21) The board has issued regulations governing police officer training standards in such areas as defense and arrest tactics and effecting an arrest. (*Id.* at ¶ 22) City of Wauwatosa Police Officers Patrick Kaine, Luke Vetter, Nicole Gabriel, and Derek Dienhart have met the minimum training requirements established by the State of Wisconsin to be certified as a police officer and have maintained their respective certifications throughout their employment with the City of Wauwatosa. (*Id.* at ¶¶ 23-24) Kaine is not only a certified law enforcement officer, but he also is an instructor for "driving for emergency vehicle operation." (ECF No. 78-2 at 10) In addition, Wauwatosa trains its officers annually on legal updates. (ECF No. 94-3, 11)

The City of Wauwatosa does not have an express policy encouraging Wauwatosa Police Department officers to conduct race-based, unsubstantiated vehicle stops. (ECF No. 93, ¶18) Wauwatosa Police Department Policy No. P17-12 "Racial Profiling" provides the following:

> Racial Profiling: Any police-initiated action that relies upon race, ethnicity, or national origin of an individual rather than the behavior of that individual, or information that leads the police to a particular individual who has been identified as being engaged in or having been engaged in criminal activity. Two corollary principles follow from this definition:
>
> 1. Police must not use racial or ethnic stereotypes as factors in selecting whom to stop and whom to search;
> 2. Police may use race or ethnicity to determine whether a person matches a specific description of a particular suspect.
>
> A sworn officer's decisions to stop, detain, question, investigate, identify, search, warn, cite, or arrest an individual will be based upon probable cause or reasonable suspicion and will not be based on racial profiling.
>
> A sworn officer may use gender, race, ethnicity, or national origin to determine whether a person matches a description of a particular suspect that they are lawfully attempting to locate.

(ECF No. 93-2) The Wauwatosa Police Department Policy No. P16-12 "Use of Force" provides the following:

> The nature of police work at times requires an officer to use force to perform his/her duties. The purpose of this policy is to provide our officers with guidelines on the use of deadly and non-deadly force.
>
> It is the policy of the Wauwatosa Police Department that police officers use only the amount of force reasonable and necessary to arrest, apprehend or control any person, or situation.
>
> The decision to use force is based on the facts and circumstances known to the officer at the time the decision to use force was made.

(ECF No. 93-3)

Plaintiffs' retained expert witness, Brian Landers is a former law enforcement officer and a current law enforcement training instructor at the Wisconsin Department of Justice and Madison College. Mr. Landers reviewed the records as outlined in his report and has given the following opinions:

> Defendant Kaine's initiation of the stop was not consistent with professional standards and training (ECF No. 59-3, 15);
>
> It would be reasonable as an instructor that Kaine would have a higher level of training and knowledge on Wisconsin's training standards, specific to how officers are trained to conduct forms of detentions and arrests (*Id.* at 9);
>
> The Wisconsin Incident Response Model that it is the basis for all tactical procedures for Wisconsin law enforcement officers (*Id.*);
>
> The Incident Response Model is trained in the basic academies as well as used in agency policies and refresher trainings (*Id.*);
>
> The Incident Response Model is also trained specifically in all unified tactics in which Wisconsin trains every police officer (*Id.*);
>
> The theory behind training the Incident Response Model is that officers from various jurisdictions are provided unified training for "proper police action" so everyone is on the same page of what is expected of them and to ensure our citizens are treated appropriately (*Id.*);
>
> Another component of Wisconsin's unified training is on the legality of contacts, detention, and arrest of persons through case law (*Id.* at 9 *citing* EVOC Manual WI Dept. of Justice Bureau of Training and Standards, 2014 at 89-93.);
>
> Two specific landmark cases that dictate proper police procedure in Wisconsin are *Terry v. Ohio* (1968) and *Graham v. Connor* (1989) (*Id.* at 9);

It would be reasonable that Officer Kaine has been properly trained on these case laws not only in his basic training, but also as a certified EVOC Instructor, which has these case laws in its curriculum (*Id.*);

Wisconsin law enforcement instructors are also expected to maintain proficiency in case law that impacts their trainings (*Id*. at 10);

All instructors, and law enforcement officers in Wisconsin are typically provided annual legal update trainings (*Id*.);

Wisconsin's Training and Standards Bureau also provides up to date legal training and information for over 20 years on their Wisconsin Law Enforcement Network website (*Id*.);

It is questionable whether Defendant Kaine, and other members of the Wauwatosa Police Department, were improperly trained as to the basis of *Terry v. Ohio*, and their legal limitations of when they can conduct investigatory contacts (*Id*. at 10);

Wisconsin also trains that "guns drawn or handcuffing" is indeed a form of custody under *Terry v. Ohio* (*Id*. at 19, *citing* Constitutional Law Training- Wisconsin Training and Standards, 2017 at 34);

Wauwatosa's lack of proper training is underscored in Defendant Vetter's deposition; the agency's policy was produced as an exhibit in his deposition as stating that officers may conduct detentions of persons based on "articulable facts" as quoted in their policy (*Id.* at 10, *citing* Vetter 30(b)(6) Depo. at 66);

Defendant Kaine fails to provide a consistent articulation of facts in his version of what information he had to justify the traffic stop (*Id*. at 10);

No reasonable officer would ask a witness to follow them to a potentially dangerous situation if a robbery was truly in progress (*Id*. at 11);

A reasonable officer who is approached by a person reporting a robbery would seek to know the description of people, description of vehicle(s), were weapons involved, direction of travel, and what the person saw to determine if this was an armed or strong-armed robbery (*Id*. at 13);

A reasonable officer, who legitimately was informed of a possible robbery occurring inside a vehicle, would be trained to conduct a high-risk approach in accordance with Wisconsin and professional standards (*Id*. at 16);

A reasonable officer who was just informed that two men were robbing a woman in a car would not walk between the suspect's car and their squad, completely abandoning their primary safety protocols and risk being shot (*Id*. at 17);

It does not make any sense that Kaine only removed Mr. Carter and did not seem to have any concerns as to what he testified to regarding the initial report of two suspects (*Id*. at 17 - 18);

If Kaine was told there were two suspects in the back seat as he testified to, his approach of the vehicle was done in complete contradiction to training and basic officer safety concerns (*Id*.);

The vehicle contacts procedures used by the Wauwatosa Police were inconsistent with state training and professional standards (*Id*.);

This irregularity would not be consistent with recording and documentation practices of law enforcement agencies for at least the past thirty years (*Id*. at 13);

The lack of determining a credible witness at the time, major inconsistencies as to the number of passengers and suspects in the car, as well as a failure by the Wauwatosa Police Department to adequately record and document the true events leads me to opine that the vehicle stop itself was not properly articulated with reasonable-suspicion, in accordance to training and professional standards (*Id*. at 14-15);

Defendant Kaine and his supporting officers failed to follow critical procedures and protocols on how to contact the occupants of this vehicle based on state training (*Id*. at 15);

Throughout the exhibits provided, the Wauwatosa officers failed to uniformly articulate what kind of stop this actually was and demonstrates a failure by the agency to properly train (*Id*. at 15);

It is highly irregular and concerning that for both evidentiary and public transparency reasons that Wauwatosa does not record all incoming and outgoing calls to the police department or properly log phone calls (*Id*. at 13);

Lt. Vetter further testifies that the radio communications, squad car position, and tactical positioning by him and Kaine would lead reasonable officers to assume upon arrival that a "high risk" stop was occurring. I opine this was Vetter's attempt to justify why weapons were readied, when Mr. Carter was not displaying any behaviors threatening deadly force and Lt. Vetter had doubts about the robbery being legitimate (*Id*. at 19, *citing* Vetter Depo. Transcript at 40-41);

Lt. Vetter, a seasoned police officer, lieutenant, and an Instructor of Wisconsin's Vehicle Contacts training course, completely disregards his training and obligations to properly control this scene (*Id.* at 19)

A reasonable police supervisor who articulates such concerns as to the legitimacy of a robbery report should have exercised more discretion and restraint in the ensuing investigatory stop and force (*Id*.);

Instead, Lt. Vetter participated in the continuation of the poorly planned and carried out stop as well as increased the force used by being the officer who hand cuffs and allows the placement of Mr. Carter in a patrol car for detention (*Id*.);

These actions show an utter disregard for the safety and rights of an innocent Mr. Carter and the co-plaintiffs who were in the vehicle (*Id*.);

If you take away a crime, threat, or resistance, there is no reasonable objective or necessity by law enforcement to use any force at all (*Id*. at 20);

Defendants Kaine and Vetter both testified that they were unsure of the legitimacy of the report of robbery. Yet, Kaine and Vetter proceeded to use force by the threat of weapons and handcuffing. (*Id*. at 20);

The force used against Mr. Carter, and the female occupants of the car was unreasonable. The officers detained and threatened force of all the car's occupants through a display of weapons, which could have led to an unintentional consequence and physical harm by the officer's actions (*Id*.);

As an Emergency Vehicle Operations Course (EVOC) instructor, Kaine would have received uniform training on the state's EVOC manual (*Id.* at 9);

The EVOC manual covers information on what Wisconsin calls "Incident Response" which is defined as "A model of systematic approach for proper police action" (*Id*.);

In Wisconsin, all law enforcement officers are trained in three methods to conduct vehicle contacts, or "traffic stops" (*Id*. at 16);

Vehicle Contacts is one of the unified tactics all officers should reasonably know. The three methods of trained vehicle contacts are summarized below:

> 1. Approach Contact. This would be the most common method in which an officer makes contact with the occupants of the vehicle by approaching the driver's side door and window. It is the most recognizable form of vehicle contact and widely considered to be a lay-person's understanding of a routine "traffic stop".
>
> 2. Non-Approach. This stop is when an officer does not approach the vehicle and calls the occupant(s) out to a pre-determined location to the side or rear of the vehicle. This approach is trained when traffic or vehicles do not allow for the officer to contact the driver/occupants as they typically would in an "Approach" method. Consider an officer stopping a semi on a busy freeway. The officer would best use a "Non-approach" method to handle this contact.

> 3. High-Risk Approach. This approach is when the officer has reason to believe the occupant(s) of the vehicle are armed or dangerous. The proper method of conducting a stop of this nature would be to communicate the coordination of the stop with multiple assisting officers, and order the occupants out at gunpoint, starting with the driver, having them walk backwards to the officer's pre-arranged squad cars, and immediately handcuffing, searching, and securing them until all occupants are out and the vehicle is then cautiously approached and cleared by officers. The "High Risk" stop is often wrongly referred to as a "felony stop", which is language close to thirty years old, but is commonly used in media and film.

(*Id*. at 15-16);

Wisconsin trains officers on how to safely perform a high-risk approach using a six-step method:

> 1. Report location and vehicle information to dispatch and request back-up.
>
> 2. Coordinate other responding officers.
>
> 3. When other officers are in position make the stop.
>
> 4. Position law enforcement vehicles properly.
>
> 5. Using the P.A, order occupants out one at a time and secure them. (Trained to do so at gunpoint, cautiously, and having occupants walk back to the armed officers to be secured and searched.)
>
> 6. Clear the vehicle properly.

(*Id*. at 16-17, *citing* Vehicle Contacts Manual WI Dept. of Justice Bureau of Training and Standards, 2014 at 46);

During a high-risk approach, the trained method is also to remove the driver first. This is done for several reasons:

> First, being that one of the key steps in a high-risk approach is to attempt to disable the mobility of the vehicle. All initial contact by the officers to the suspect vehicle is done with the driver. The driver is commanded to shut off the engine and remove the keys from the ignition or place the keys/starting device on the hood of the car prior to exit.
>
> A second reason to remove the driver first is so officers can attempt to gain information about other occupants in the car. In this instance, if properly done, the driver would have been removed first to remove the robbery victim from the car as well as gain knowledge as to the suspects and weapons inside.

(*Id*. at 17, *citing* Vehicle Contacts Manual WI Dept. of Justice Bureau of Training and Standards, 2014 at 49-50)

Dated this 19th day of July, 2022.

**WIRTH + BAYNARD**
Attorneys for Defendants

 */s/ Kiley Zellner*
Kiley B. Zellner, WI Bar No. 1056806
9898 W. Bluemound Road, Suite 2
Wauwatosa, Wisconsin 53226
T: 414) 291-7979 / F: (414) 291-7960
Email: kbz@wbattys.com

Dated this 19th day of July, 2022.

Attorney for Plaintiffs

 */s/ Joy Bertrand*_____

Joy Bertrand, Attorney
Wisconsin Bar Number 1029483
PO Box 2734
Scottsdale, AZ  85252-2734
Office – 602-374-5321
Fax – 480-361-4694
Email – joyous@mailbag.com
www.joybertrandlaw.com