**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**

AKIL K. CARTER, et al.,

                              Plaintiffs,

v.                                                        Case No. 19-CV-1422

CITY OF WAUWATOSA, et al.,

                              Defendants.

## DEFENDANTS' BRIEF IN SUPPORT OF SUMMARY JUDGMENT

Defendants, Barry Weber, Patrick Kaine, Luke Vetter, Nicole Gabriel, Derek Dienhart, and the City of Wauwatosa by and through their counsel, Wirth + Baynard, respectfully submit this Brief in Support of their Motion for Summary Judgment.

## BACKGROUND

On September 2, 2018, City of Wauwatosa Police Officer Patrick Kaine was on patrol when he was flagged down by a citizen, Carl Anderson, who frantically reported having just witnessed an in-progress robbery. (ECF No. 58-2, 34-35; ECF No. 78-2, 45:5—46:22) Anderson gave a description of the vehicle and identified it stopped at the light ahead. (ECF No. 58-2, 35 42; ECF No. 78-2, 45:5—46:22; ECF No. 93-5 at 00:01-00:56; ECF No. 78-2, 50:3-13) Officer Kaine observed Anderson to be speaking in an excited manner. (ECF No. 78-2, 46:16-22) In response to that information, Officer Kaine initiated a *Terry* stop of the vehicle. Plaintiffs Carter, Barr, and Adams were passengers in the vehicle. (ECF No. 1-2, ¶¶ 27, 30; ECF No. 93-4) The stop lasted approximately 11 minutes. (ECF No. 93-5 at 00:55-12:35) During that time, Plaintiff Carter was handcuffed for 5 minutes while Officers confirmed the safety of the vehicle's occupants. (ECF No. 93-5 at 11:05) It was ultimately determined that Anderson was mistaken, and the robbery complaint was a very unfortunate misunderstanding.

1

To begin, Plaintiffs do not specify against whom each of their claims is alleged. Rather, Plaintiffs make vague reference to "Defendants", "officers", or "colleagues" as a whole. (ECF. No. 1-2, ¶¶ 56, 59, 66, 76, 79, 84, 86, 90, 93, 95, 96, 99) "Plaintiffs may not relay on 'vague references to a group of 'defendants,' without specific allegations tying the individual defendants to the alleged conduct. As such, the Complaint fails to place each defendant "on notice of what exactly [he or she] might have done to violate [the plaintiffs'] rights under the Constitution, federal law, or state law and therefore fails to state a claim for relief as to the individual defendants.

First, Plaintiffs allege the Defendants deprived Plaintiffs of their rights in violation of 42 U.S.C. § 1983. (ECF. No. 1-2, 11)

Second, Plaintiffs allege that City of Wauwatosa and Chief Weber are liable under 42 U.S.C. § 1983 via *Monell v. Dept. of Soc. Svcs.*, 436 U.S. 658 (1978), for failure to adequately train, supervise, and discipline its employees, and due to *de facto* policies and customs "of condoning racial profiling in traffic stops and rights violations." (*Id.* at 11-16)

Third, Plaintiffs allege three Wisconsin Constitutional violation claims for: (1) violation of due process under the Wisconsin Constitution (*Id.* ¶¶ 78, 79); (2) right to be free unreasonable searches and seizures in violation of Art. 1, Sect. 11 of the Wisconsin Constitution (*Id.* at 17); and (3) "right to equal treatment under the Wisconsin Constitution" in violation of Art. 1, Sect.1 (*Id.* ¶ 84).

 Fourth, Plaintiffs allege five state-law claims: (1) that the officers were negligent "in stopping a vehicle based only upon being waived down by unknown persons and detaining the occupants" (*Id*. ¶¶ 75, 76); (2) negligent infliction of emotional distress for ordering Carter out of the vehicle "at gunpoint" *(Id.* ¶¶ 86-90); (3) negligent hiring, training, and promotion based on the City "insisting" the officers conduct was "consistent with the officers' training and the city's

policies" *(Id.* ¶¶ 92, 93); (4) false imprisonment *(Id.* ¶¶ 95, 96); and (5) intentional infliction of emotional distress *(Id.* ¶¶ 98-100).

## ARGUMENT

I.  **SUMMARY JUDGMENT MUST BE GRANTED IF THERE ARE NO GENUINE ISSUES OF MATERIAL FACT AND THE DEFENDANTS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW.**

Summary judgment is proper if the pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits, establish that no genuine issue as to any material fact exists and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. The initial burden is on the moving party to demonstrate, with or without supporting affidavits, the absence of a genuine issue of material fact and that judgment as a matter of law should be granted to the movant. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A material fact is one that is outcome-determinative of an issue in the case with substantive law identifying which facts are material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Once the moving party has met this initial burden, the opposing party must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial. *Id.* at 248. The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. *Id.* at 242. Nor will speculation, hearsay, or conclusory allegations suffice to defeat summary judgment. *Gobitz v. Corvilla, Inc.*, 196 F.3d 879, 882 (7th Cir. 1999).

Here, the undisputed facts show that the Defendants are entitled to judgment as a matter of law. Therefore, for the reasons outlined below, summary judgment is appropriate as to all the Defendants on all of Plaintiffs' claims, which should be dismissed on their merits and with prejudice.

3

## II. LUKE VETTER, NICOLE GABRIEL, DEREK DIENHART AND BARRY WEBER ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW AS TO PLAINITFFS' SECTION 1983 CLAIMS BECAUSE THEY LACK PERSONAL INVOLVEMENT.

The Seventh Circuit has "long held that liability under § 1983 must be predicated upon personal responsibility." *Starzenski v. City of Elkhart*, 87 F.3d 872, 880 (7th Cir. 1996)

In this case, it is undisputed that Defendants Vetter, Gabriel, and Dienhart did not have "direct personal involvement" in the initial *Terry* stop of the vehicle. (ECF No. 91, ¶ 4; ECF No. 94-7; ECF No. 94-4; ECF No. 92, ¶¶ 7-8; ECF No. 94-3, 32-33). None of these Defendants arrived on scene until after Officer Kaine had already pulled over Plaintiffs' vehicle. *Id.* Accordingly, they lack the direct personal involvement in the initial *Terry* stop and are entitled to judgment as a matter of law on Plaintiffs' Section 1983 claim involving an illegal stop.

In addition, to the extent this Court allows Plaintiff Carter to proceed on an excessive force claim based on Officer Kaine unholstering his gun—even though such a legal theory is not clearly brought in the Complaint—the only fact alleged is that "Officer Kaine ordered Mr. Carter out of the vehicle, while Officer Kaine had his firearm drawn." (ECF No. 1-2, ¶31) Therefore, any Fourth Amendment excessive force claim should be dismissed against those same Defendants for lack of personal involvement.

The same is true for Defendant Weber as it would relate to any individual-capacity Section 1983 claims alleged against him. Plaintiffs' allegations are insufficient to establish the personal involvement necessary to expose Defendant Weber to individual-capacity Section 1983 liability. Accordingly, Defendant Weber is entitled to judgment as a matter of law on all Plaintiffs' Section 1983 claims.

## III. ALL DEFENDANT OFFICERS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW AS TO PLAINTIFFS' SECTION 1983 CLAIMS.

To survive summary judgment on a claim brought under 42 U.S.C. § 1983, Plaintiffs must prove that they were deprived of a right secured by the Constitution or federal law by someone acting under color of law. *Parratt v. Taylor*, 451 U.S. 527, 535 (1981). A prerequisite to any section 1983 action is a constitutional violation, and without establishing the requisite constitutional depravation, the claim cannot survive. 42 U.S.C. § 1983.

Plaintiffs couched their first cause of action as "Violations of Plaintiffs' Civil Rights Under 42 U.S.C. § 1983." (ECF No. 1-2, p. 11) First, the statute is not "itself a source of substantive rights, but merely provides a means for vindicating federal rights elsewhere conferred." *Graham v. Connor*, 490 U.S. 386, 393–94 (1989). The Complaint fails to identify the substantive right and only generally references "the above-mentioned conduct." (*Id.* at ¶¶ 53-57). For this reason alone, Plaintiffs' section 1983 claim fails as a matter of law.

Plaintiffs seemingly meant to bring a section 1983 claim for an illegal stop of their vehicle and brief detention in violation of their Fourth Amendment rights. (ECF No. 1-2, ¶¶ 1, 53-57). If the Court concludes Plaintiffs' section 1983 claim should proceed as such, those claims would also fail as a matter of law.

### A. Plaintiffs' Section 1983 *Terry* stop claims are governed by the Fourth Amendment.

The Supreme Court has repeatedly recognized that an officer may, consistent with the Fourth Amendment, initiate a brief investigative stop of an automobile when that officer has reasonable suspicion to believe that criminal activity is afoot. To show reasonable suspicion, an officer need only "be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry v. Ohio*, 392 U.S. 1, 21 (1968). The purpose of such a stop is to confirm or dispel the officer's suspicion. The

5

"determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior," *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000), and "practical considerations of everyday life," *Navarette v. California*, 572 U.S. 393, 402, 134 S. Ct. 1683 (2014) Reasonable suspicion can exist even when the conduct might have a lawful explanation. *See Navarette* at 403.

An officer's suspicion is not infallible. But the Constitution generally, and *Terry* specifically, allow for the fact that sometimes an innocent person will be stopped. *See Wardlow*, 528 U.S. at 126 ("*Terry* accepts the risk that officers may stop innocent people."). These principles apply with full force to investigative stops based on information from anonymous tips. *Adams v. Williams, 407 U.S. 143, 147 (1972)*. For an anonymous tip to serve as the basis for reasonable suspicion, the tip must "be reliable in its assertion of illegality, not just in its tendency to identify a determinate person." *Florida v. J.L.*, 529 U.S. 266, 272 (2002).

Moreover, a call to the police is more likely to support reasonable suspicion in the *Terry* analysis when it describes an ongoing crime or emergency. *See United States v. Howell*, 958 F.3d 589, 599 (7th Cir. 2020). As such, the Seventh Circuit has traditionally given more leeway to police reliance on anonymous 911 calls where the caller "reported an ongoing emergency." *United States v. Williams*, 731 F.3d 678, 685 (7th Cir. 2013).

The Court in *Navarette v. California* considered a tip like the one challenged here. There, an unnamed 911 caller reported that a silver pickup truck had just run her off the road. *Id.* at 395. The *Navarette* Court ultimately concluded that the "call bore adequate indicia of reliability" because the caller (1) "claimed eyewitness knowledge" of the event, (2) provided a "contemporaneous report," and (3) used the 911 emergency system. *Id.* at 398–400.

Like the tipster in *Navarette*, Anderson claimed, "eyewitness knowledge" and provided a "contemporaneous report" of an in-progress robbery. (ECF No. 58-2, 34-35; ECF No. 78-2, 45:5—46:22) Wisconsin Statute § 943.32 makes robbery a crime. Further, Anderson made the report face to face from his vehicle. (ECF No. 58-2, 34-35; ECF No. 78-2, 45:5—46:22) While Anderson did not initially provide his name, he was not anonymous—Officer Kaine saw him, his vehicle, and observed his demeanor. (ECF No. 58-2, 34-35; ECF No. 78-2, 45:5—46:22; ECF No. 78-2, 46:16-22) Anderson provided a description of the suspect vehicle and pointed it out. (ECF No. 58-2, 35 42; ECF No. 78-2, 45:5—46:22; ECF No. 93-5 at 00:01-00:56; ECF No. 78-2, 50:3-13)

The limited purpose of the investigatory stop in this case was to confirm or dispel the suspicion that Carter was engaged in criminal activity. Prior to conducting the investigative stop, Officer Kaine identified specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warranted a brief investigatory stop. (ECF No. 78-2, 46:16-22; ECF No. 58-2, 35, 42) It was therefore reasonable under the Fourth Amendment.

### B. Plaintiffs' Section 1983 *Terry* seizure claims are governed by the Fourth Amendment.

The investigation following a *Terry* stop must be reasonably related in scope and duration to the circumstances that justified the stop in the first instance so that it is a minimal intrusion on the individual's Fourth Amendment interests. *United States v. Robinson*, 30 F.3d 774, 784 (7th Cir. 1994). There is no bright-line rule as to how long an investigative detention may last; instead, courts look to whether the police diligently pursued a means of investigating that was likely to confirm or quickly dispel their suspicions. *United States v. Adamson*, 441 F.3d 513, 521 (7th Cir. 2006). Police officers do not convert a *Terry* stop into full custodial arrest by drawing their weapons or handcuffing the subject, particularly where the situation is inherently dangerous. *See United States v. Tilmon*, 19 F.3d 1221, 1224-25 (7th Cir. 1994).

7

For example, in *United States v. Bullock*, the Seventh Circuit held that, as a matter of law, plaintiff's thirty-to-forty-minute detention, that included being handcuffed, placed in a squad car, and transported to a residence was reasonable under *Terry* and justified because the officers had reasonable suspicion that plaintiff was and had been engaged in criminal activity. 632 F.3d 1004, 1015-1016 (7th Cir. 2011) Addressing the plaintiff's contention that he had been patted down and no weapons were discovered, the court reasoned, the officers could still "reasonably believe that Bullock was potentially dangerous and a flight risk because of his awareness of the search warrant, his association with the residence, and the officers' reasonable suspicion that he was involved in narcotics distribution." *Id.* at 1016.

Here, the total time between Officer Kaine initiating the traffic stop and Plaintiffs being released from the scene was approximately eleven minutes. (ECF No. 93-5 at 00:55-12:35) Carter was ordered out of the vehicle through the PA system (ECF No. 93-5 at 05:10; ECF No. 92, ¶ 11), ordered to his knees (ECF No. 92, ¶ 13; ECF No. 94-3, 41:5-6; ECF No. 93-5 at 05:58) and placed in handcuffs (ECF No. 92, ¶¶ 14-17, 21; ECF No. 94-8, at 01:07-01:17). Although Officer Kaine initially had his firearm unholstered (ECF No. 78-2, 58:18-24), he holstered his weapon as soon as Carter was placed in handcuffs. (ECF No. 93-5 at 7:04; ECF No. 94-8 at 00:41-00:43) It is undisputed that no weapons were ever pointed at Plaintiffs. (ECF No. 78-2, 58:18—59:22; ECF No. 59-1, 26:14-15) Carter was patted down before being placed in the back of a squad car with the door open. (ECF No. 92, ¶¶ 14-17, 21; ECF No. 94-8, at 01:07-01:17) Carter was in handcuffs for approximately five minutes (ECF No. 93-5 at 11:05) and in the back of the squad car for approximately 2 minutes. (ECF No. 93-5 at 08:40-10:56) Crucially, as soon as it was determined there was not a robbery in progress Plaintiffs were released.

## IV. THE INDIVIDUAL DEFENDANTS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW AS TO PLAINTIFFS' SECTION 1983 STOP AND SEIZURE CLAIMS BASED ON QUALIFIED IMMUNITY.

Governmental officials performing discretionary functions are shielded from liability so far as their conduct does not violate any clearly established constitutional rights of which a reasonable person would have known. *Hinnen v. Kelly*, 992 F.2d 140, 142 (7th Cir. 1993). Officials are entitled to immunity if, when they acted, they "reasonably could have believed that [their] action[s] did not violate a clearly established law." *Cham v. Wodnick*, 123 F.3d 1005, 1008 (7th Cir. 1997). "As the qualified immunity defense has evolved, it provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

There is generally a two-part test in determining whether qualified immunity should be granted to a governmental actor: (1) whether the plaintiff has established a deprivation of a constitutional right; and, if so, (2) whether the right was clearly established at the time of the alleged violation. *Wilson v. Layne*, 526 U.S. 603, 609 (1999). The question of whether immunity attaches is a question of law. *Elder v. Holloway*, 510 U.S. 510, 516 (1994). If qualified immunity applies to an officer's conduct, "the officer should not be subject to liability or, indeed, even the burdens of litigation." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004).

In considering the two-step procedure for addressing the defense of qualified immunity as articulated in *Wilson,* district courts are invited to proceed directly to the second prong; namely, whether the constitutional right was clearly established in a particularized sense, even if there is a material issue of fact that would prevent summary judgment on the underlying question of whether there was indeed a constitutional deprivation. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

9

When the defense of qualified immunity is raised, the plaintiff bears the burden of proving the existence of a clearly established right. *Kernats v. O'Sullivan*, 35 F.3d 1171, 1176 (7th Cir. 1994). Further, the plaintiff bears the burden of showing that the alleged violation was clearly established "before the defendants acted or failed to act." *Rice v. Burk*, 999 F.2d 1172, 1174 (7th Cir. 1993). The plaintiff must demonstrate the existence of a clearly established right by identifying a closely analogous case that had decided that the conduct was forbidden. *Forman v. Richard Police Department*, 104 F.3d 950, 958 (7th Cir. 1997).

### A.   Officer Kaine had "arguable" reasonable suspicion for the *Terry* stop.

Officer Kaine is entitled to qualified immunity in this context if a reasonable officer could have believed that "arguable" reasonable suspicion for the *Terry* stop and brief detention. *See Huff v. Reichert*, 744 F.3d 999, 1007 (7th Cir. 2014) ("Due to qualified immunity's protection, an officer needs only 'arguable' probable cause."); *Rouei v. Vill. of Skokie*, 61 F. Supp. 3d 765, 778 (N.D. Ill. 2014) ("[Q]ualified immunity exists in a false arrest case where there is 'arguable' probable cause, ... and thus it likely exists in a false *Terry* stop case where there is 'arguable' reasonable suspicion."). Arguable reasonable suspicion and probable cause are established when a reasonable officer in the same circumstances and possessing the same knowledge as the officer in question could have reasonably believed that reasonable suspicion or probable cause existed considering well-established law. *See Humphrey v. Staszak*, 148 F.3d 719, 725 (7th Cir. 1998).

Here, Officer Kaine at least "arguable" reasonable suspicion for the *Terry* stop and brief detention.

### B.   Responding Defendants Patrick Kaine, Luke Vetter, Nicole Gabriel, and Derek Dienhart were entitled to rely on Officer Kaine's legal conclusions.

The immunity analysis has so far focused on Officer Kaine because he alone conducted the stop of Plaintiffs' vehicle. Defendants Vetter, Gabriel, and Dienhart responded to the scene after

the vehicle was stopped. The same rules and principles as above apply to these officers, except that they are also entitled to reasonably rely on Officer Kaine's legal conclusions. *See Duran v. Sirgedas*, 240 Fed. Appx. 104, 115 (7th Cir. 2007). Therefore, even if the Court were to conclude factual disputes prevent it from determining whether reasonable suspicion supported Officer Kaine's initial stop, those factual disputes are immaterial as to these officers because they reasonably assumed that Officer Kaine had a basis for stopping the vehicle and ordering Carter out of the vehicle.

Lieutenant Vetter was the second to arrive on the scene and believed he was responding to an in-progress vehicle robbery. (ECF No. 92, ¶¶ 7-8; ECF No. 94-3, 32-33) Upon arriving on the scene, he observed the stopped blue Lexus and also observed Officer Kaine standing outside of his squad car behind the open driver's side door for safety and cover. (ECF No. 92, ¶¶ 7-8) Lt. Vetter was part of a group of responding officers who had just been dispatched to the scene of an in-progress robbery. (ECF No. 92, ¶¶ 7-8; ECF No. 94-3, 32-33) Under these circumstances, Lt. Vetter could reasonably rely on Officer Kaine's statement that he wanted to order Carter out of the vehicle to investigate if there was a robbery in progress. Lt. Vetter's role was limited to placing Carter in handcuffs and conducting a pat down for weapons. (ECF No. 92, ¶¶ 14-17, 21; ECF No. 94-8, at 01:07-01:17)

Officer Dienhart was dispatched and was the third officer on the scene. (ECF No. 59-1, 24:21-24; ECF No. 91, ¶¶ 2-3; ECF No. 94-7) Officer Dienhart believed he was responding to a high-risk traffic stop. (ECF No. 91, ¶5) When Officer Dienhart arrived on the scene, he observed both Officer Kaine and Lt. Vetter outside of their squads ordering a subject to walk backward toward their vehicles and the subject had his arms up. (ECF No. 91, ¶ 4; ECF No. 94-7) Under these circumstances, he could reasonably rely on Officer Kaine's assessment of the situation. It

was Officer Dienhart's role to cover the driver's side of the vehicle. (ECF No. 91, ¶ 6) Accordingly, Officer Dienhart got his rifle, exited his squad, and pointed the rifle toward the driver's side of the vehicle. (ECF No. 91, ¶ 6, ECF No. 59-1, 24:3—25: 13) It is undisputed he did not point his weapon at any of the Plaintiffs. (ECF No. 59-1, 26:14-15) Officer Dienhart was on the scene for approximately 4 minutes. (ECF No. 91, ¶¶ 8-11; ECF No. 94-7 at 00:45-4:43)

Officer Gabriel was the fourth officer to arrive on the scene and her role was as an assisting officer. (ECF No. 94-4, 13) Officer Gabriel believed she was responding to a robbery and, when she arrived on-scene, she observed the other officers had a subject detained. (ECF No. 92, ¶ 21; ECF No. 94-8 at 01:07-03:04 ECF No. 94-4, 13-16; ECF No. 94-8 at 00:43-06:14; ECF No. 93-4 at 08:42-10:55) Carter was turned over to Officer Gabriel who seated Carter in the back of a squad car. *Id.* Under these circumstances, Officer Gabriel could reasonably rely on Officer Kaine's statement that he was investigating an in-progress robbery and Lt. Vetter's request for her to get some background information from Carter. Officer Gabriel spoke with Carter for approximately two minutes and then released him when Officer Kaine confirmed with the vehicle occupants there was no robbery in-progress. (ECF No. 93-5 at 08:40-10:56)

## V. OFFICER KAINE IS ENTITLED TO JUDGMENT AS A MATTER OF LAW IF THE COURT CONCLUDES CARTER MADE A SECTION 1983 EXCESSIVE FORCE CLAIM AGAINST HIM.

Plaintiffs' Complaint alleges that Officer Kaine ordered Mr. Carter out of the vehicle, while Officer Kaine had his firearm drawn (ECF No. 1-2, ¶ 31) and Mr. Carter was ordered to the ground and then detained. *Id.* at ¶ 31. As discussed above, the Complaint does not clearly allege a Fourth Amendment excessive force claim but, to the extent this Court concludes Carter did so allege one, it fails as a matter of law.

12

"The Fourth Amendment's reasonableness standard governs [the Court's] evaluation of a plaintiff's claim that law-enforcement officers employed excessive force during an arrest, an investigatory stop, or any other type of seizure." *Stainback v. Dixon*, 569 F.3d 767, 771 (7th Cir. 2009). To that end:

> The nature and extent of the force that may be used depends upon the circumstances surrounding the arrest, including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he [or she] is actively resisting arrest or attempting to evade arrest by flight."

*Id.* at 772. Courts must consider these factors "as they would have appeared to a reasonable officer at the scene" and, in doing so, "recognize that officers often need to make split-second judgments based on rapidly developing events." *Id.* "In the end, the excessive force inquiry 'looks to whether the force used to seize the suspect was excessive in relation to the danger he posed—to the community or to the arresting officers—if left unattended.'" *Jacobs v. City of Chicago*, 215 F.3d 758, 773 (7th Cir. 2000).

The Seventh Circuit has held, on three notable occasions, that "the mere pointing of a handgun at a person, with no physical contact, could potentially rise to the level of an excessive show of force if found to be objectively unreasonable under the circumstances." *Baird v. Renbarger*, 576 F.3d 340 (7th Cir. 2009); *Jacobs v. City of Chicago*, 215 F.3d 758 (7th Cir. 2000); and *McDonald v. Haskins*, 966 F.2d 292 (7th Cir. 1992). To begin, it is undisputed that Officer Kaine did not point his firearm at Carter. (ECF No. 78-2, 58:18—59:22) Moreover, those three cases are readily distinguishable from the case at hand.

In *McDonald v. Haskins*, the Seventh Circuit found that the defendant officer was not entitled to dismissal on qualified immunity grounds when he "held a gun to the head of McDonald, a 9–year- old child, and threatened to pull the trigger." 966 F.2d at 292. The Seventh Circuit stated

13

that the most salient facts to its analysis ("the very ingredients relevant to an excessive force inquiry") were that:

> [1] McDonald was not under arrest; Haskins did not merely point a gun at McDonald but rather, [2] held a gun to McDonald's head and [3] threatened to pull the trigger; and McDonald was, at the time the incident occurred, [4] only nine years old. Moreover, McDonald, according to the complaint, [5] posed no threat to Haskins, to his fellow officers, [6] or to the general community.

*McDonald*, 966 F.2d at 294. Considering those six factors, it is undisputed that Officer Kaine did not hold a gun to Plaintiff's head, did not threaten to pull the trigger, and Carter was an adult. Moreover, when Officer Kaine ordered Carter out of the vehicle, he did not know whether Carter posed a threat; he was investigating a robbery, a very serious crime, and had no way of knowing how Carter would react to police officers stopping the vehicle and ordering him out of the vehicle.

In *Jacobs v. City of Chicago*, the defendant police officers obtained a search warrant for a building that was described as a single-family home on the warrant but was in fact a three-unit apartment building. 215 F.3d 758, 763-64 (7th Cir. 2000). Each unit was searched, and the occupant of one of those units brought an excessive force claim after "one of the officers placed a gun to Jacobs' head for over ten minutes during the initial period of the search of his apartment." *Id.* at 773. In finding the officers were not entitled to qualified immunity, the Court found it most relevant that:

> [1] The officer kept the gun pointed at Jacobs for over ten minutes, [2] even after ascertaining that Jacobs was not the person he was looking for, and [3] during which time Jacobs did nothing more threatening than provide the officer with his identification and ask the officer for permission to sit down . . . [and that] at the time the Defendant Officers entered Jacobs' apartment, [4] they do not appear to have had probable cause to suspect Jacobs had committed any crime or to believe that any criminal activity was being conducted in Jacobs' apartment.

*Id.* at 773–74. Again, the case at hand differs from *Jacobs* in several significant respects. Most significantly, Officer Kaine never pointed his weapon at Carter (ECF No. 78-2, 58:18—59:22) and

14

the moment Carter was secured, Officer Kaine holstered his gun (ECF No. 93-5 at 7:04; ECF No. 94-8 at 00:41-00:43).

In *Baird v. Renbarger*, the Seventh Circuit upheld a denial of summary judgment based on qualified immunity after the defendant officer held multiple people at gunpoint with a 9-millimeter submachine gun while investigating the possible alteration of a vehicle identification number. 576 F.3d 340, 342 (7th Cir. 2009). Specifically, while investigating the possible VIN alteration, Renbarger not only detained everyone at the auto body shop but "rounded up anyone in the surrounding shops and warehouse." *Id.* at 343. Applying the *Graham* factors, the Court found it relevant that the suspected crime was "a far cry from crimes that contain the use of force as an element, crimes involving possession of illegal weapons, or drug crimes, all of which are associated with violence." *Id.* at 344. In addition, the officers had no "reason to suspect that there was any threat to the safety of the officers involved," or indeed that most individuals detained at gunpoint had committed any crime. *Id.*

In the present case, both the nature of the suspected crime and the suspected relationship of Carter to that crime are vastly different than in *Baird*. Officer Kaine was investigating what he believed to be an in-progress robbery by Carter.

Relying on the Seventh Circuit's reasoning in *McDonald*, *Jacobs,* and *Baird,* courts have found that holding a criminal suspect at gunpoint until they have been handcuffed is reasonable as a matter of law. For example, in *Rebolar v. City of Chicago*, a twelve-year-old boy was suspected of breaking into cars during a parade. 897 F.Supp. 2d 723, 729 (N.D. Ill. 2012). Officers held the boy a gunpoint until he was handcuffed. *Id.* at 730. Rebolar brought an excessive force claim against the officers based, in part, on the fact that he was held at gunpoint. *Id*. at 735. The court was easily able to distinguish the cases discussed above to find that the "facts [were] not sufficient

as a matter of law to establish that excessive force was used when the plaintiff was detained and taken into custody." *Id.* at 737.

Likewise, in this case, it is undisputed that Officer Kaine only had his weapon unholstered until Mr. Carter was handcuffed. (ECF No. 93-5 at 7:04; ECF No. 94-8 at 00:41-00:43). In addition, it is undisputed that about 2 minutes elapsed between Mr. Carter exiting the vehicle and being placed in handcuffs. (ECF No. 93-5 at 05:10-05:59) Because the facts here so closely mirror those in *Rebolar*, this Court should also find that Mr. Carter's alleged facts "are not sufficient as a matter of law to establish that excessive force was used…" *Id.* at 737.

Even if Officer Kaine's use of force in allegedly briefly unholstering his gun was not objectively reasonable as a matter of law, cases like *Rebolar* show that his use of force did not violate clearly established law.

## VI. THE CITY OF WAUWATOSA AND BARRY WEBER ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW AS TO PLAINTIFFS' MUNICIPAL LIABILITY AND OFFICIAL CAPACITY SECTION 1983 CLAIMS.

Plaintiffs assert claims against the City of Wauwatosa and Defendant Weber for a general failure to train, discipline, and supervise their officers (ECF No. 1-2, ¶¶ 62-64); having a *de facto* policy, regulation, decision, or custom condoning racially motivated vehicle stops and occupant seizures (*Id.* ¶¶ 65-67); and having a *de facto* policy and/or custom of condoning excessive force (*Id.* ¶ 68).

Initially, because a suit against a governmental official in his official capacity is treated as a suit against the official's employing a governmental entity, "district courts routinely dismiss official capacity claims against individuals as 'redundant' where the appropriate municipality is also named." *Comsys, Inc. v. City of Kenosha Wisconsin*, 223 F. Supp. 3d 792, 802 (E.D. Wis. 2016). For this reason, claims against Defendant Weber in his official capacity should be

dismissed. Moreover, Defendant Weber retired from his position at the Wauwatosa Police Department on June 1, 2021, thus, under Fed.R.Civ.P. 25(d)(1), his successor—James MacGillis—should automatically be substituted as a party. Thus, Defendant Weber should be dismissed entirely.

A plaintiff who seeks to impose municipal liability under Section 1983 must prove that an "official municipal policy" caused the complained-of injury. *Monell v. Dept. of Soc. Services of City of New York*, 436 U.S. 658, 691 (1978). To do so:

> a plaintiff must prove (1) the alleged deprivations were conducted pursuant to an **express policy, statement, ordinance, or regulation** that, when enforced, **caused** the constitutional deprivation; (2) the conduct was one of a **series of incidents amounting to an unconstitutional practice** so **permanent**, well-settled, and known to [the municipality] as to constitute a "custom or usage" **with force of law**; or (3) the conduct was caused by a decision of a municipal policymaker with final policymaking authority in the area in question.

*Abraham v. Piechowski*, 13 F. Supp. 2d 870, 880 (E.D. Wis. 1998) (emphasis added). Plaintiffs "must demonstrate that the 'deliberate action attributable to [City of Wauwatosa] itself is the "moving force"' behind the deprivation of [Plaintiffs'] *Monell*, 436 U.S. at 694. "The required level of factual specificity rises with the complexity of the claim," and courts must disregard mere recitations of "legal conclusions or elements of the cause of action . . . ." *McCauley v. City of Chicago*, 671 F.3d 611, 616–17 (7th Cir. 2011).

A municipality can be found liable under Section 1983 only if the governmental body itself "subjects" a person to a deprivation of constitutional rights or "causes" a person "to be subjected" to such deprivation. *Monell*, 436 U.S. at 692. Local governments are responsible only for "their own illegal acts." *Id.* at 665–83. They cannot be held vicariously liable for the acts of their employees. *Brown*, 520 U.S. at 403.

17

In the present case, Plaintiffs are unable to point to any specific City policy with constitutionally suspect language as it relates to the officers' interactions with Plaintiffs, let alone that such policy caused the officers to deprive Plaintiffs of their constitutional rights. In fact, it is undisputed that the City of Wauwatosa does not have an express policy encouraging officers to conduct race-based, unsubstantiated vehicle stops (ECF No. 93, ¶18) but rather had a policy prohibiting "use [of] racial or ethnic stereotypes as factors in selecting whom to stop… " (ECF No. 93-2) Instead, Plaintiffs flatly allege that the City's "*de facto* policy, regulation, decision, or custom condoning racially-motivated vehicle stops and occupant seizures, and/ or violating persons' constitutional and civil rights effectuating vehicle stops." (ECF No. 1-2, ¶ 66)

To being, it is undisputed that two of the plaintiffs are Caucasian and one is African American, thus even this incident fails to support Plaintiffs alleged *de facto* policies. Moreover, while a custom or practice "may be so persistent and widespread [such that it has] the force of law," "[t]he word 'widespread' must be taken seriously." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167 (1970). To demonstrate that a municipality "is liable for a harmful custom or practice, the plaintiff must show that [municipal] policymakers were deliberately indifferent as to the known or obvious consequences." *Thomas v. Cook County Sheriff's Department*, 604 F.3d 293, 303 (7th Cir. 2010). A "widespread practice" "requires more evidence than a single incident to establish liability." *Calhoun*, 408 F.3d at 380. Plaintiffs must provide "evidence that there is a true municipal policy at issue, not a random event." *Id.* The Seventh Circuit has declined to adopt bright-line rules defining a "widespread practice", recognizing that "there is no clear consensus as to how frequently such conduct must occur to impose *Monell* liability except that it must be more than one instance ... or even three." *Thomas*, 604 F.3d at 303.

18

"In other words, they must have been aware of the risk created by the custom or practice and must have failed to take appropriate steps to protect the plaintiff." *Thomas*, 604 F.3d at 303. Under this stringent standard, "it is not enough to demonstrate that policymakers could, or even should, have been aware of the unlawful activity because it occurred more than once." *Phelan v. Cook Cnty.*, 463 F.3d 773, 790 (7th Cir. 2006). Rather, there must be "evidence demonstrating that the unlawful practice was so pervasive that acquiescence on the part of policymakers was apparent and amounted to a policy decision." *Id.*

There is no evidence that shows officers were acting pursuant to a custom or practice such that their conduct was part of a widespread pattern where the custom or practice was the driving force behind other similar incidents. Plaintiffs have not alleged nor has discovery revealed any other instance of racial profiling in *Terry* stops, vehicle stops, occupant seizures, or excessive force. Rather, Plaintiffs' allegations against the City and Barry Weber amount to veiled attempts to hold the City Defendants vicariously liable for the acts of its employees based on vague allegations of a generic pattern of conduct.

Plaintiffs also generally allege that these Defendants failed to train employees, but a *Monell* claim requires more. To establish a failure to train claim, "[a] pattern of similar constitutional violations is ordinarily necessary to demonstrate deliberate indifference." *Id.* at 62. Even if "a particular officer may be unsatisfactorily trained" that "will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program." *City of Canton v. Harris*, 489 U.S. 378, 390-91 (1989).

Here, there is no evidence the City was aware of or put on notice of any allegedly unconstitutional conduct attributable to inadequate training or that the City knew it was highly predictable that such constitutional deprivations would occur without more or different training

because there was a pattern of similar constitutional violations. Moreover, the training of City officers, as well as all other police officers in the state, is governed by § 165.85, Wis. Stats., which establishes the Law Enforcement Standards Board, and empowers it to establish minimum curriculum requirements for police officer training. (ECF No. 93, ¶¶ 20, 21) It is undisputed these Officers have met the minimum training requirements established by the State of Wisconsin to be certified as a police officer and have maintained their respective certifications throughout their employment with the City of Wauwatosa. (*Id.* at ¶¶ 23-24)

Plaintiffs seemingly attempt to illustrate their unlawful policy and/or failure-to-supervise *Monell* claim by referencing news articles regarding "two other excessive-use-of force incidents on African American young men." (ECF No. 1-2, ¶ 25) However, the plaintiffs fail to provide any information which establishes the link between the occurrence of those incidents and the *Terry* stop of Plaintiffs (i.e., one references an officer-involved shooting and the other alleges an officer punched a youth in the face). Moreover, articles are hearsay and cannot be used to prove that the incidents occurred.

Likewise, Plaintiffs very generally claim that the City failed to supervise and discipline its police officer employees which also fails. (ECF No. 1-2, ¶¶ 68, 73) In limited circumstances, failure-to-investigate/discipline/supervise can give rise to municipal liability under § 1983 because a policy of condoning abuse may embolden a municipal employee and facilitate further abusive acts. *Sigle v. City of Chicago*, 2013 WL 1787579 (N.D. Ill. Apr. 25, 2013). However, the mere fact that a policymaker failed to investigate, discipline, or supervise its employees is insufficient for establishing municipal liability. *Monfils v. Taylor*, 165 F.3d 511, 517 (7th Cir. 1998). A plaintiff must show that the governmental body caused the deprivation and must satisfy the deliberate indifference standard adopted in *Canton*. *See Abraham*, 12 F. Supp. 2d at 881.

The deliberate indifference standard is "a high threshold," and "[e]ven where significant evidence has been presented indicating flawed investigatory, [disciplinary or supervisory] procedures, courts still reject [such a theory] where plaintiffs cannot demonstrate 'tacit authorization by city policymakers.'" *Id.* Courts have explained that:

> A custom of failing to discipline, [investigate or supervise] police officers can be shown to be deliberately indifferent if the need for further discipline, [investigation or supervision] is so obvious and [established] procedures so inadequate as to be likely to result in the violation of constitutional rights such that a jury could attribute to the policymakers a deliberate indifference to the need to discipline, [investigate or supervise].

*Id.*, \*3 (emphasis added). Evidence of statistics and complainants registering allegations alone are insufficient to support a *Monell* claim. *Strauss v. City of Chicago*, 760 F.2d 765, 769 (7th Cir. 1985) (dismissing *Monell* claim where the record was devoid of any evidence other than statistical summaries of complaints filed with the police department and stating that the number of complaints alone "does not indicate that the policies that [plaintiff] alleges do in fact exist and did contribute to his injury.").

For example, in *J.G. ex rel. Koss v. Lingle*, 2014WL 4273269 (W.D. Wis. Aug 28, 2014), the court dismissed a § 1983 municipal liability claim premised on a failure-to-investigate and failure-to-discipline theory. The Plaintiff in that case brought an excessive force claim under the Fourth and Fourteenth Amendment against a police officer and a *Monell* claim against the City for failing to investigate and discipline. *Id.*, \*1. The court explained:

> In support of his claim, [plaintiff] generally contends that defendants do not have very much experience dealing with children with developmental delays, failed to conduct a thorough investigation of [defendant officer's] use of force against [plaintiff] (by not interviewing other students), failed to investigate [defendant officer's] three previous takedowns of middle-schoolers in one month to examine whether there was a pattern of excessive use of force and determined that only one out of 30 to 50 uses of force by the Sun Prairie police was excessive.

*Id.*, \* 9.

> As defendants point out, [plaintiff] has not provided any context with respect to the 30 to 50 incidents involving a use of force or [defendant officer's] previous three takedowns. The undisputed facts show that the Sun Prairie Police Department investigated all instances involving an officer's use of force, including the incident [at issue], and the department found no excessive force. Apart from criticizing the investigation of the incident in the instant case, [plaintiff] has presented no facts from which a jury could conclude that any of the department's previous investigations were lacking or that the investigated incidents actually involved use of excessive force. . . . Without such evidence, a reasonable jury could not conclude that there was an <u>obvious problem</u> with excessive force investigations of which city officials like defendants . . . should have been aware.

*Id.*, * 10 (emphasis added). Here, there simply is no evidence that the City failed to supervise police officer employees. Thus, Plaintiffs' *Monell* allegations fail not only because there was no constitutional deprivation in this case as a matter of law, but because the evidence is insufficient to withstand summary judgment on a *Monell* claim.

## VII.    PLAINTIFFS' WISCONSIN CONSTITUTIONAL CLAIMS SHOULD BE DISMISSED.

Plaintiffs allege in Counts 4-6 violations arising solely out of the Wisconsin Constitution. (ECF No. 1-2, 16-18) First, the plaintiffs do not have a § 1983 cause of action for violation of the state constitution, because "[t]o state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States ...." *West v. Atkins*, 487 US. 42, 48 (1988).

These allegations further fail as state-law constitutional claims. The Wisconsin constitution does not authorize suits for money damages except in the context of a takings claim which does not apply in this case. *Goodvine v. Swiekatowski*, 594 F. Supp. 2d 1049, 1054 (W.D. Wis. 2009). To the extent plaintiffs are seeking an injunction for a violation of their rights under the Wisconsin Constitution, this court cannot address that request for relief. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 104 S. Ct. 900 (1984) (state sovereign immunity prohibits federal courts from ordering state officials to comply with state law).

## VIII. DEFENDANTS ARE IMMUNE FROM PLAINTIFFS' REMAINING STATE LAW CLAIMS.

The Complaint also asserts state law claims against the Defendants based on the same set of operative facts. (ECF No. 1-2, 16, 18-20) Plaintiffs' state-law claims are barred by state-law governmental immunity. Governmental immunity under Wisconsin law is "extremely broad." *Estate of Perry v. Wenzel*, 872 F.3d 439, 463 (7th Cir. 2017). Such immunity is committed to the Wisconsin statutes as follows:

> No suit may be brought against any volunteer fire company organized under ch. 213, political corporation, governmental subdivision or any agency thereof for the intentional torts of its officers, officials, agents or employees **nor may any suit be brought against such corporation, subdivision or agency or volunteer fire company or against its officers, officials, agents or employees for acts done in the exercise of legislative, quasi-legislative, judicial or quasi-judicial functions.**

Wis. Stat. § 893.80(4).

Wisconsin's governmental immunity broadly "provides that state officers and employees are immune from personal liability for injuries resulting from acts performed within the scope of their official duties." *Pries v. McMillon,* 326 Wis. 2d 37, 784 N.W.2d 648, 654 (2010). Wisconsin courts have interpreted this protection as extending to all conduct involving "the exercise of discretion and judgment." *Milwaukee Metro Sewerage Dist. v. City of Milwaukee*, 277 Wis. 2d 635, 672, (2005). "There are four exceptions to this broad doctrine: (1) the performance of ministerial duties; (2) the performance of duties with respect to a 'known danger;' (3) actions involving medical discretion; and (4) actions that are 'malicious, willful, and intentional.'" *Perry*, 872 F.3d at 462.

Here, all of the Defendants are entitled to immunity under Wis. Stat. § 893.80(4), as none of the exceptions apply. First, the medical-discretion exception does not apply. Second, based on

23

the discussions above, there is no admissible evidence in the record that the Defendants' actions were malicious, willful, and intentional. Third, the known-danger exception is inapplicable.

Fourth, the ministerial-duty exception is inapplicable. "Just because a jury can find that certain conduct was negligent does not transform that conduct into a breach of a ministerial duty." *Kimps v. Hill*, 200 Wis. 2d 1, 11, 546 N.W.2d 151 (1996) At summary judgment, Plaintiffs must do more than simply allege that a ministerial duty exists—they must provide evidence of the source of the ministerial duty in order for the Court to evaluate whether the exception applies. Plaintiffs have not and cannot do this; therefore, to the extent that the Defendants were negligent, discretionary immunity shields them from liability.

Here, the Officers' decisions concerning whether and how to conduct the *Terry* stop are discretionary for purposes of Section 893.80(4). Clearly, such decisions call for "the exercise of judgment or discretion rather than the mere performance of a prescribed task." *Spencer v. Brown County*, 215 Wis.2d 641, 573 N.W.2d 222, 226–27 (App.1997).

For example, in *Sheridan v. City of Janesville*, 164 Wis.2d 420, 474 N.W.2d 799 (App.1991), the plaintiff sued two police officers and their municipal employer claiming that he sustained injuries caused by the officers' negligence during his arrest for drunk driving. The trial court determined that Section 893.80(4) shielded the officers from negligence liability. The Court of Appeals affirmed noting first that "a claim that the police officers were negligent in deciding whether or not to arrest [the plaintiff]" would be shielded by governmental immunity because the decision to arrest "clearly" involved discretion. *Id.*, 474 N.W.2d at 802 (emphasis added). The *Sheridan* majority reached a similar conclusion with respect to the officers' conduct in executing the arrest. In determining that the officers' conduct in executing the arrest was discretionary, the majority noted:

> [The officers'] decisions regarding the manner in which the arrest was effectuated involved numerous applications of governing statutes and case law. They were required to determine whether [the plaintiff] should be searched, handcuffed, subjected to force during the execution of the arrest, and given a breathalyzer These decisions involved subjective evaluation of the law.

474 N.W.2d at 802 (quotation omitted).

The federal courts have consistently followed *Sheridan* in addressing claims of statutory immunity for arresting officers under Section 893.80(4). Thus, the so-called "ministerial duty exception" is inapplicable in this case.

### A.      Negligence Claims Against Defendant Officers.

Plaintiffs allege that Officer Kaine was "negligent in stopping a vehicle based only upon being waived-down by unknown persons." (ECF No. 1-2, ¶ 75.) Plaintiffs also allege the Officers were "negligent in detaining the vehicle's occupants, particularly after Ms. Barr got out of the vehicle and informed the officers that Mr. Carter was her grandson, and that no crime was being committed." (ECF No. 1-2, ¶ 76.)

Plaintiffs further allege the Defendants' conduct constitutes negligent infliction of emotional distress for each of these citizens. (ECF No. 1-2, ¶ 86.) To state a claim for negligent infliction of emotional distress under Wisconsin law, a plaintiff must allege that: (1) the defendant's conduct fell below the applicable standard of care; (2) the defendant suffered severe emotional distress; and (3) the defendant's conduct was a cause-in-fact of the plaintiff's emotional distress. *Bowen v. Lumbermens Mut. Cas. Co.*, 183 Wis.2d 627, 632, 517 N.W.2d 432 (1994).

For both of these claims, Plaintiffs allege Defendants violated a duty of "ordinary care." The Wisconsin Supreme Court in *Osborne v. Montgomery*, 203 Wis. 223, 234 N.W. 372, 375–76 (1931) described "ordinary care" as follows:

> While it is true that the standard thus set up is varying and indefinite, it is nevertheless one which may be fairly and justly applied to human conduct. Such a standard is usually spoken

25

of as "ordinary care," being that degree of care which under the same or similar circumstances the great mass of mankind would ordinarily exercise.

By definition, "ordinary care" involves the exercise of discretion and judgment for which immunity applies. Again, under Wis. Stat. § 893.80(4), governmental bodies and their employees are immune from liability for acts involving the exercise of discretion or judgment and the determination of reasonable suspicion is the ultimate discretionary function for which governmental immunity was intended.

## B.  Negligent Hiring, Training, or Supervision Claim Against City.

Wisconsin recognizes the tort of negligent hiring, training, or supervision. *See Miller v. Wal-Mart Stores, Inc.*, 219 Wis. 2d 250, 580 N.W.2d 233 (1998). To state a claim, Plaintiffs must demonstrate that: (1) the employee committed a wrongful act, whether it be a negligent tort, an intentional tort, or a violation of public policy as evidenced by existing statutory law; (2) that the act or omission of the employee was a cause-in-fact of the plaintiff's injury; (3) that the employer breached that duty; and (4) and that the act or omission of the employer was a cause-in-fact of the wrongful act of the employee. *Id.*; *see also* Wis JI-Civil 1383. The entirety of Plaintiffs' negligent "hiring, training, and promotion" claim provides:

> The City has insisted that the Defendants' conduct and his in stopping this vehicle based only on the "flagging down" by one, possibly two unknown witnesses, with no further corroboration, separating and detaining the one African-American male at gunpoint in police vehicle, and detaining the two other occupants, is consistent with the officers' training and the city's policies.

(ECF No. 1-2, ¶ 92) This claim is not clearly pled, but under Wis. Stat. § 893.80(4), governmental bodies are immune from liability for acts involving the exercise of discretion or judgment and Plaintiffs' claim does not support any exception to such immunity.

## C.  Intentional Infliction of Emotional Distress.

Plaintiffs contend the "stop and detention were intentional acts intended to intimidate Mr.

26

Carter, Ms. Barr, and Ms. Adams. The result has been extreme emotional distress and anxiety for each of them. (ECF No. 1-2, ¶ 100) To state a claim for intentional infliction of emotional distress under Wisconsin law, a plaintiff must allege that: (1) the defendant's conduct was intended to cause emotional distress; (2) the defendant's conduct was "extreme and outrageous"; (3) the defendant's conduct was a cause-in-fact of the plaintiff's emotional distress; and (4) the plaintiff suffered an extreme disabling emotional response to the defendant's conduct. *See Rabideau v. City of Racine*, 2001 WI 57, ¶ 33, 243 Wis.2d 486, 627 N.W.2d 795.

The Plaintiffs must establish that the purpose of the conduct was to cause emotional distress. There must be something more than a showing that the defendant intentionally engaged in the conduct that gave rise to emotional distress in the plaintiff; and the plaintiff must show that the conduct was engaged in for the purpose of causing emotional distress. Intent may be evidenced by inferences from words, conduct, or the circumstances in which events occurred. *Id.*

As discussed above, the Officers' decisions were within their professional discretion. None of these decisions were motivated by malicious intent. Plaintiffs offer no evidence to support an inference that the Officers acted with any intent to cause emotional distress, nor do they explain how these actions constituted "extreme and outrageous conduct" or resulted in an extreme disabling condition. Plaintiffs' self-diagnosis of an "extreme disabling emotional response" is not supported by medical evidence in the record. Moreover, the irrefutable video evidence of the Officers' interactions with Plaintiffs shows anything but "extreme and outrageous conduct" by the Officers. (ECF Nos. 93-5 and 93-4)

## D.    Common Law False Imprisonment

Plaintiffs allege that Officers restrained their physical liberty without lawful authority. (ECF No. 1-2, ¶ 96) Under Wisconsin law, a tort of false imprisonment consists of the "unlawful

27

restraint by one person of the physical liberty of another." *Lane v. Collins*, 29 Wis. 2d 66, 138 N.W.2d 264 (1965); s*ee also* Wis. Stat. § 940.30. As discussed above, the Officers' decisions here were also within their professional discretion.

## IX. PLAINTIFFS' PUNITIVE DAMAGE CLAIM MUST BE DISMISSED.

Plaintiffs seek punitive damages against "each of the above-named Defendants, jointly and severally, for punitive damages… (ECF No. 1-2, ¶ 102) Punitive damages are not recoverable under § 1983 against a municipality or, by logical extension, a defendant sued in his official capacity. *See Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981). As such, Plaintiffs punitive damage claim against the City and Barry Weber must be dismissed. As to the remaining Defendants, no evidence exists to support this claim. To award punitive damages against these Defendants, a jury would have to find that their conduct was "motivated by evil motive or intent or [that] it involve[d] reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56, (1983). There is no evidence in this case that any of the Officers' actions were willful, wanton, or in reckless disregard of Plaintiffs' rights.

## X. PLAINTIFFS' CLAIM FOR EQUITABLE RELIEF SHOULD BE DISMISSED FOR LACK OF STANDING.

Plaintiffs seek "declaratory, injunctive, and other equitable relief reforming the Defendant City of Wauwatosa policies, practices, and procedures to prevent like actions and harms in the future." (ECF No. 1-2, ¶ 103) Standing to bring such a claim requires that (1) a plaintiff has suffered an injury in fact; (2) there exists a causal connection between the injury and the conduct of the defendant; and (3) it is likely that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). A plaintiff must establish "that he is in immediate danger of sustaining some direct injury." *Robinson v. City of Chicago*, 868 F.2d 959, 966 (7th Cir.1989). As the Supreme Court stated in *O'Shea v. Littleton*, 414 U.S. 488, 495–96

(1974): "Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief ... if unaccompanied by any continuing, present adverse effects." Plaintiffs' request for equitable would be based purely on speculation and insufficient to establish standing.

## XI.    THE CLAIMS AGAINST THE JOHN DOE DEFENDANTS FAIL TO STATE CAUSES OF ACTION AND MUST BE DISMISSED.

Plaintiffs named John Does 1-3 and Jane Does 1-3 as party defendants in their Complaint. (ECF No. 1-2, pp. 1, 5) However, Plaintiffs have failed to identify the John Doe or Jane Doe officers and have failed to amend their Complaint within the time allowed by the Federal Rules of Civil Procedure. *See* Fed.R.Civ.P. 15(a)(1).

## CONCLUSION

For the reasons stated above, Defendants respectfully request the Court dismiss all of Plaintiffs' claims against them, with prejudice and with such costs and disbursements as the Court deems equitable. Dismissal of the unidentified John Does 1-3 and Jane Does 1-3 parties is also warranted.

Dated this 19th day of July, 2022.

WIRTH + BAYNARD
Attorneys for Defendants

 */s/ Kiley Zellner*
Kiley B. Zellner, WI Bar No. 1056806
9898 W. Bluemound Road, Suite 2
Wauwatosa, Wisconsin 53226
T: 414) 291-7979 / F: (414) 291-796
Email: kbz@wbattys.com