# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

AKIL K. CARTER, PAULETTE H.
BARR, and SANDRA K. ADAMS,

                    Plaintiffs,

v.

CITY OF WAUWATOSA, BARRY
WEBER, PATRICK KAINE, LUKE
VETTER, NICOLE GABRIEL, DEREK
DIENHART, JOHN DOES 1–3, and
JANE DOES 1–3,

                    Defendants.

Case No. 19-CV-1422-JPS

**ORDER**

## 1.     BACKGROUND

This action arises from a police-initiated traffic stop in September 2018. Plaintiffs Akil Carter, Paulette Barr, and Sandra Adams bring this action, alleging violations of federal and state law, against Defendants the City of Wauwatosa; Barry Weber ("Chief Weber"), Chief of Police of the City of Wauwatosa at the time this action was filed;[1] and Patrick Kaine, Luke Vetter, Nicole Gabriel, Derek Dienhart, and six John and Jane Doe

---

[1] Plaintiffs state that Barry Weber is named only in his official capacity (although this is not clear from the face of their complaint). *See* ECF No. 104 at 3. As Defendants point out, Barry Weber retired as Chief of Police in 2021. ECF No. 97 at 17. His successor, James MacGillis, will be substituted as a defendant. *See* Fed. R. Civ. P. 25(d). However, since the parties have consistently referred to Defendant *Weber* in their summary judgment briefing, the Court will do the same in this order.

officers,[2] all law enforcement officers employed by the City of Wauwatosa Police Department ("WPD") (collectively, the "Officer Defendants"). ECF No. 1-2.

Plaintiffs primarily allege that Defendants violated their constitutional rights during a traffic stop.[3] *Id.* The three bases Plaintiffs appear to allege to support their Fourth Amendment unlawful search and seizure claim are (1) Defendant Kaine initiated a traffic stop of Plaintiffs' vehicle without a sufficient legal basis to do so, (2) Defendant Kaine conducted an investigative detention of Plaintiff Carter, pursuant to the

---

[2]Defendants also point out that the John and Jane Doe officer defendants named in the original complaint have not subsequently been identified or named in an amended complaint. ECF No. 97 at 29. Because Plaintiffs' time to amend their complaint has expired, *see* Fed. R. Civ. P. 15(a)(1), and because Plaintiffs' own summary judgment submissions make no mention of the John and Jane Doe officer defendants, these defendants will be dismissed from the case.

[3]Plaintiffs' complaint states that the action "is brought under the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution." ECF No. 1-2 at 2. Two of the ten counts in the complaint allege federal causes of action. Count One does not state which specific constitutional right(s) the Defendants allegedly violated, but rather asserts "Violations of the Plaintiffs' Civil Rights Under 42 USC § 1983" as the cause of action. *Id.* at 11. Likewise, Count Two is entitled "*Monell* liability" without specifying which specific constitutional rights the City of Wauwatosa's acts violated.

Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution." *Baker v. McCollan*, 443 U.S. 137, 144, n.3 (1979). By extension, *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978) also cannot be read to confer substantive rights. Before exploring liability under § 1983, the Court must "isolate the precise constitutional violation" Defendants allegedly committed. *Baker*, 443 U.S. at 140. The Court adopts Defendants' construction of Plaintiffs' federal constitutional claims and each of their factual bases as arising under the Fourth Amendment's prohibition against unlawful search and seizure, as applied to the states by the Fourteenth Amendment. *See also* note 16 *infra*.

Case 2:19-cv-01422-JPS   Filed 08/10/22   Page 2 of 38   Document 108

traffic stop, which exceeded the scope of the legal basis for the stop, and (3) the Officer Defendants used excessive force against Mr. Carter during this investigation. *Id.* The Officer Defendants are sued in their individual capacities for these alleged violations. Plaintiffs also sue the City of Wauwatosa, arguing municipal liability under *Monell* for the alleged Fourth Amendment violations due to a de facto policy to allow, and/or a failure to train, discipline, and supervise WPD employees to avoid, racial profiling or constitutional violations in WPD-administered traffic stops. *Id.* at 11–16.

Plaintiffs allege an array of state- and common-law claims against the Officer Defendants as well. *Id.* at 16–20; *see also* ECF No. 104 at 3. Plaintiffs allege that the Officer Defendants violated Plaintiffs' rights under the Wisconsin Constitution to due process, to equal treatment, and to be free from unreasonable search and seizure. ECF No. 1-2 at 16–18. Plaintiffs further assert a claim of negligence based on the circumstances under which the Officer Defendants both initiated and continued the traffic stop; one claim each of both negligent and intentional infliction of emotional distress; a claim of false imprisonment; and a claim of negligent hiring, training, and promotion. *Id.* at 16–20.

This case—set for a jury trial on August 22, 2022—has been pending for almost three years. Defendants removed this action from Milwaukee County Circuit Court to the Eastern District of Wisconsin and it was assigned to this Court on September 30, 2019. ECF No. 1. After a series of modifications to the briefing schedule and extensions of time; denial of the parties' initial cross-motions for summary judgment, ECF No. 65; denials of various motions related to discovery disputes, ECF Nos. 83 and 90; and two

mediation sessions that failed to resolve the litigation, the parties chose to file dispositive motions on the eve of trial.

On July 19, 2022, Defendants filed a motion for summary judgment and, in keeping with applicable protocols, a joint statement of facts. ECF Nos. 95 and 96. On July 26, 2022, Plaintiffs filed an amended cross-motion for partial summary judgment that adopted the joint statement of facts. ECF No. 100. Plaintiffs then filed their response to Defendants' initial motion for summary judgment on August 2, 2022, along with a statement of the facts they dispute. ECF Nos. 103 and 104.

Although the motions are not yet fully briefed, the Court has determined from the parties' submissions that sufficient disputes of fact exist such that summary judgment for either side is precluded; further response and reply briefs would not alter this conclusion.[4] Accordingly, the Court is obliged to deny the parties' cross-motions for summary judgment.

## 2.     LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016). A fact is "material" if it "might affect the outcome of the suit" under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of fact is "genuine" if "the evidence is such that a

---

[4]This is not the first time in this case that the Court has taken the step of ruling on the parties' motions before full briefing. *See* ECF No. 65 at 1 (denying cross-motions for summary judgment to prevent further instances of the parties' "protracted and resource-draining approach to resolving litigation").

Case 2:19-cv-01422-JPS   Filed 08/10/22   Page 4 of 38   Document 108

reasonable jury could return a verdict for the nonmoving party." *Id.* The court construes all facts and reasonable inferences in the light most favorable to the non-movant. *Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 360 (7th Cir. 2016). "The court must not weigh the evidence presented or determine credibility of witnesses; the Seventh Circuit instructs 'that [the court] leave[s] those tasks to factfinders.'" *H–D U.S.A., LLC v. SunFrog, LLC*, 311 F. Supp. 3d 1000, 1010 (E.D. Wis. 2018) (quoting *Berry v. Chi. Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010)). "[T]he non-movant need not match the movant witness for witness, nor persuade the court that her case is convincing, she need only come forward with appropriate evidence demonstrating that there is a pending dispute of material fact." *Waldridge v. Am. Hoeschst Corp.*, 24 F.3d 918, 921 (7th Cir. 1994).

**3.     RELEVANT FACTS**

Alongside Defendants' opening brief, the parties submitted a joint statement of material facts. ECF No. 96. The Court will adopt the relevant[5] agreed-upon facts with minor, non-substantive edits.[6]

---

[5]Almost five pages of the parties' joint statement of facts is the contents of a report from Plaintiffs' expert witness, Brian Landers. The Court has excised this material. Even if the parties have stipulated to inclusion of this material as a "fact," the decision to credit expert witness testimony is for the jury, not the Court. Plaintiffs may not stipulate their way out of the basic allocation of courtroom decision-making power.

[6]Video and audio recordings of the traffic stop of Plaintiffs have been submitted, and the Court will adopt the parties' underlying citation to these materials when the joint statement of facts quotes verbal statements directly from them (but will exclude underlying citations to video imagery). Similarly, the Court will adopt the parties' underlying citation to deposition transcripts where they are quoted directly.

### 3.1 The Traffic Stop

On September 2, 2018, Plaintiff Sandra Adams was driving a blue Lexus vehicle with Plaintiff Paulette Barr riding in the front passenger seat and Plaintiff Akil Carter riding in the back seat. *Id.* at 1. Mr. Carter is the grandson of Ms. Barr. Ms. Adams and Ms. Barr are Caucasian. Mr. Carter is African American. *Id.*

Defendant Patrick Kaine ("Officer Kaine") and Carl Anderson, a citizen and a witness in this case, have testified that, on September 2, 2018, at approximately 11:50 a.m., Mr. Anderson contacted Officer Kaine who was in a marked Wauwatosa Police Department squad parked near North 106th Street and West Burleigh Street. *Id.* Mr. Anderson reported to Officer Kaine that he saw what he believed to be "a possible robbery that's taking place in that blue Lexus that's going westbound on Burleigh." *Id.* (quoting ECF No. 62[7] at 35 (Anderson deposition transcript)). Officer Kaine testified in his deposition that Mr. Anderson was speaking in an excited manner. *Id.* (citing ECF No. 78-2 at 46:16–22).

Mr. Anderson also testified in his deposition that he told Officer Kaine that he saw something in Mr. Carter's[8] hand, which Mr. Anderson described as follows:

---

[7]The joint statement of facts cites to Mr. Anderson's deposition transcript by the ECF docket number assigned to it when Plaintiff originally filed it under seal. The deposition transcript is not sealed and is viewable at ECF No. 62. The Court has updated references to Mr. Anderson's deposition transcript accordingly.

[8]The parties have stipulated to this phrasing. However, in his deposition testimony, Mr. Anderson does not refer to Mr. Carter by name or indicate that, at the time he allegedly spoke with Officer Kaine, he had identified the person in the vehicle as Mr. Carter. *See* ECF No. 62 at 40–43.

A. I said it was a long black object in his hand, it may be a gun. It looked like a gun.

Q. But it wasn't longer than this iPhone?[9]

A. I didn't see—I only saw maybe about two or three inches of it because the right hand was—his right hand was over her left shoulder.

*Id.* at 2 (quoting ECF No. 62 at 42 (Anderson deposition transcript)).

Officer Kaine then notified dispatch: "I just got flagged down at Mayfair and Burleigh that there is an individual robbing two females in a blue Lexus." *Id.* (quoting ECF No. 94-1 at 0:00-0:20 (radio dispatch transcript)). Dispatch assigned Officers Nicole Gabriel and Derek Dienhart to assist with the traffic stop. Lieutenant Luke Vetter ("Lieutenant Vetter") was also near the area and heard Officer Kaine radio regarding the robbery complaint and responded to assist. *Id.*

Officer Kaine also radioed dispatch to send someone to try to locate the citizen who flagged him down and provided the following information: that the vehicle of "the citizen who flagged me down may be either behind me or over at 107th and Burleigh" and was a "blue Chevy" containing a "black male driver" and "another person in the passenger seat." *Id.* (quoting ECF No. 94-1 at 1:55–2:12 and citing ECF No. 93-5 at 01:19–01:32 (footage from front-facing camera in Officer Kaine's squad vehicle)). Police Officer Julie Gibbs went to the surrounding area of North 106th Street and West Burleigh Street but did not locate the vehicle or the complainant that had flagged Officer Kaine down. *Id.*

---

[9]The parties agree that the iPhone referenced at this point during Mr. Anderson's deposition was an iPhone X. ECF No. 96 at 2.

Case 2:19-cv-01422-JPS   Filed 08/10/22   Page 7 of 38   Document 108

Once traffic started to proceed westbound on Burleigh Street with the green light, Officer Kaine observed a blue Lexus, 2011, model ES350, 4-door, with Wisconsin plate number 212-GJZ, traveling westbound through the intersection. *Id.* There were no other blue Lexus cars in the intersection. *Id.* Officer Kaine proceeded westbound following the blue Lexus and observed that there was at least one person in the back seat and two people sitting in the front seats, but he could not distinguish any race until the car was stopped. *Id.* While following the Lexus, Officer Kaine did not observe the driver violate any traffic law. *Id.*

Officer Kaine testified as follows regarding following the Lexus:

Q: Okay. As you're following this Lexus, what if anything do you observe the people in the car do?

A. Nothing jumps out at me that they're doing this or that. They're just driving along, as far as I can tell.

Q. They're going the speed limit or below the speed limit—

A. From recollection, yes.

Q. They're staying in the lane and not driving erratically, correct?

A. Not that I can recall.

Q. Do you see any people in the car make any furtive movements?

A. No.

Q. Other than the statement of the person in the blue Chevrolet, do you have any reason to believe that there is a violation of any kind occurring with this Lexus?

A. No. No.

*Id.* (quoting ECF No. 78-2 at 55:4–20 (Kaine deposition transcript)).

Page 8 of 38

Officer Kaine then turned on his lights and initiated a traffic stop of the blue Lexus in the 11400 block of West Burleigh Street. *Id.* at 3. The blue Lexus pulled over at 11:51:00 a.m. *Id.* Officer Kaine waited for other officers to arrive and did not approach the vehicle. *Id.* While waiting for backup, Officer Kaine made verbal contact with the occupants of the blue Lexus through his squad car's PA and instructed "everybody put up their hands in the car." *Id.* (quoting ECF No. 93-5 at 01:42–01:54 (Kaine squad car dash footage)).

Lieutenant Vetter was the second to arrive on the scene. Lieutenant Vetter believed he was responding to "a robbery occurring inside a blue vehicle."[10] Upon arriving on the scene, he observed the stopped blue Lexus with two women in the front seat and one male in the back seat. Lieutenant Vetter also observed Officer Kaine standing outside of his squad car behind the open driver's side door for "some cover and safety." *Id.* (quoting ECF No. 94-3 at 32–33 (Vetter deposition transcript)). Lieutenant Vetter approached Officer Kaine and the two formulated a plan. *Id.*[11]

Once backup arrived, Officer Kaine ordered, "Person in the back seat. I need you to step out of the car with your hands up, facing away from us. Do you understand?" *Id.* (quoting ECF No. 93-5 at 05:10 (Kaine squad car dash footage)). The rear passenger side door then opened and a person, who was later identified as Mr. Carter, exited, and walked backwards

---

[10]The parties have not provided a citation to the record for this direct quote; it is sufficient that the parties have stipulated to its occurrence.

[11]The parties stipulate in the joint statement of facts that "Lieutenant Vetter never pointed his service weapon at Carter or any occupants of the Lexus." *Id.* at 4. However, the parties' fact statements do not address whether or when Lieutenant Vetter ever *un*holstered his service weapon.

toward the officers, as instructed. *Id.* Mr. Carter was ordered to his knees. *Id.* Mr. Carter was placed in handcuffs by Lieutenant Vetter to detain him in order to further investigate the robbery complaint. *Id.* Mr. Carter was also patted down for weapons. *Id.* Mr. Carter was not armed. Mr. Carter remained calm and respectful throughout. *Id.*

Officer Derek Dienhart ("Officer Dienhart") heard Officer Kaine's dispatch communication and was dispatched to the area near 114th Street and West Burleigh Street to assist. He was the third officer on the scene and parked to the left of Officer Kaine's vehicle. *Id.* Officer Dienhart believed he was responding to a high-risk traffic stop. *Id.* When Officer Dienhart arrived on the scene, he observed both Officer Kaine and Lieutenant Vetter outside of their squad cars ordering a subject to walk backwards toward their vehicles. *Id.* The subject had his arms up. *Id.*

Officer Dienhart believed his role upon arrival was a cover officer. *Id.* Accordingly, Officer Dienhart got his rifle (an AR-15), exited his squad, and pointed the rifle at "a low ready position basically covering" the driver's side of the vehicle. *Id.* (quoting ECF No. 59-1 at 24:3–25:13 (Dienhart deposition transcript)). In the low ready position, the rifle was "not pointed at an individual or at the vehicle directly." *Id.* (quoting ECF No. 59-1 at 26:14–15). Officer Dienhart had "charged"[12] the AR-15. *Id.* Once Officer

---

[12]The parties employ the word "charged" without further explanation. The Court assumes this refers to the act of either chambering a round in the firearm or moving the firearm's hammer or firing mechanism to a position such that the firearm is ready to fire. *See Glossary of Firearms Terms*, WIKIPEDIA, https://en.wikipedia.org/wiki/Glossary_of_firearms_terms (last visited Aug. 5, 2022).

Dienhart realized that "maybe this isn't what it was initially reported as" he "brought the gun down and had it pointed straight down at the ground." *Id.* (quoting ECF No. 59-1 at 29:19–24). Officer Dienhart was on the scene for approximately four minutes. *Id.*

Officer Nicole Gabriel was the fourth officer to arrive on the scene and her role was as an assisting officer. *Id.* at 4. Officer Gabriel believed she was responding to a robbery, and when she arrived on-scene she observed the other officers had a subject detained. *Id.* Lt. Vetter then escorted Mr. Carter to the back of Officer Kaine's squad car, where Mr. Carter was seated and turned over to Officer Gabriel until the investigation could be completed. *Id.*

Once Mr. Carter was secured, Officer Kaine holstered his gun[13] and approached the blue Lexus. *Id.* Officer Kaine never pointed his service weapon at Mr. Carter or at the occupants of the vehicle. *Id.* When Officer Kaine's service weapon was unholstered it was pointed "down to the side." *Id.* (quoting ECF No. 78-2 at 58:18–24 (Kaine deposition transcript)). When asked why he made the decision to carry his weapon unholstered and down, Officer Kaine testified:

> By the time I stopped the car, to that point, based on the behaviors of the driver of the blue Lexus and his grandmother who was in in the front passenger seat, I didn't get the feeling

---

[13]The parties do not state in the joint statement of facts, and Plaintiffs' statement of disputed facts does not address, when exactly Officer Kaine *un*holstered his service weapon. (The complaint alleges that Officer Kaine "ordered Mr. Carter out of the vehicle, while Officer Kaine had his firearm drawn." ECF No. 1-2 at 8.)

that they were the victims of a robbery in progress, which is
what I was told[.]

*Id.* (ECF No. 78-2, 59:7–22).

Officer Kaine spoke with the front seat passenger, Ms. Barr, and the
driver, Ms. Adams. Ms. Barr told Officer Kaine that Mr. Carter was her
grandson and there was no robbery. *Id.* Officer Kaine then apologized
multiple times and said that Mr. Carter was going to be released. *Id.* Officer
Gabriel further explained the situation to Mr. Carter and apologized for the
misunderstanding. *Id.* Officer Gabriel was on-scene with Plaintiffs for
approximately six minutes. *Id.* While on scene, Officer Gabriel never
unholstered her weapon. *Id.*

Once it was determined that the complaint was unfounded and that
there was no robbery in progress, the handcuffs were removed, and Mr.
Carter was released. *Id.* Mr. Carter was in handcuffs for approximately five
minutes. *Id.* Mr. Carter was in the back of the squad car for approximately
two minutes with the squad door open. *Id.* The total time between Officer
Kaine initiating the traffic stop and Plaintiffs being released from the scene
was approximately eleven minutes. *Id.*

After the officers determined the complaint was unfounded but
before Plaintiffs drove away from the scene, Officer Kaine is recorded in his
squad car video as telling Mr. Carter that there was a "black guy robbing
two white ladies." *Id.* at 5 (quoting ECF No. 93-5 at 12:01:13 (Kaine squad
car dash footage)). Defendant Kaine followed up that statement by telling
Ms. Carter the witness was "he himself was the color of yourself." *Id.* Kaine
is also heard telling Mr. Carter, "[I]t's not something I made up." *Id.*
(quoting ECF No. 93-5 at 12:01:45). After Mr. Carter was released, Officer

Kaine is heard telling one of the other officers on scene that the basis for the stop was that he was told there was a "black dude robbing two white ladies." *Id.* (quoting ECF No. 93-5 at 12:02:22). In the immediate seconds, if not minutes, following the stop, Officer Kaine is heard explaining his stop to his colleagues that he was told one black male was "robbing" two white females. *Id.*

Officer Kaine's incident report, dated September 4, 2018, states that the driver of a "newer blue passenger car (possibly a Chevrolet)" who was a "M/B in his 40's" told him that "two black guys" were robbing a white female driver in the blue Lexus. *Id.* (citing to ECF No. 78-2 at 46 (Kaine deposition transcript)).[14] Officer Kaine's report quoted the language, "two black guys." *Id.* (citing to ECF No. 78-2 at 46). In his deposition, Officer Kaine testified that he recalled the tipster telling him "[t]hat there were two black guys in the back seat of a blue Lexus and that they were robbing a white lady." *Id.* (quoting ECF No. 78-2 at 48).

### 3.2    City of Wauwatosa and WPD Policies

The City of Wauwatosa does not have an express policy encouraging Wauwatosa    Police    Department    officers    to    conduct    race-based,

---

[14]The parties have not provided a copy of Officer Kaine's incident report. The quoted language in this sentence is attributed to ECF No. 78-2, Officer Kaine's deposition transcript. However, the quoted language does not appear in the deposition transcript. Additionally, the deposition transcript reflects that Officer Kaine was, at this point in the deposition, recounting his memory of the interaction with Mr. Anderson, not viewing his incident report, or recounting his memory of writing the report. The Court will nonetheless adopt this as a stipulated material fact.

unsubstantiated vehicle stops. *Id.* Wauwatosa Police Department Policy No. P17-12, "Racial Profiling," provides the following:

> Racial Profiling: Any police-initiated action that relies upon race, ethnicity, or national origin of an individual rather than the behavior of that individual, or information that leads the police to a particular individual who has been identified as being engaged in or having been engaged in criminal activity.
>
> Two corollary principles follow from this definition:
>
> Police must not use racial or ethnic stereotypes as factors in selecting whom to stop and whom to search[.]
>
> Police may use race or ethnicity to determine whether a person matches a specific description of a particular suspect.
>
> A sworn officer's decisions to stop, detain, question, investigate, identify, search, warn, cite, or arrest an individual will be based upon probable cause or reasonable suspicion and will not be based on racial profiling.
>
> A sworn officer may use gender, race, ethnicity, or national origin to determine whether a person matches a description of a particular suspect that they are lawfully attempting to locate.

ECF No. 96 at 6 (quoting ECF No. 93-2 (Chief Weber declaration)).

The Wauwatosa Police Department Policy No. P16-12 "Use of Force" provides the following:

> The nature of police work at times requires an officer to use force to perform his/her duties. The purpose of this policy is to provide our officers with guidelines on the use of deadly and non-deadly force.
>
> It is the policy of the Wauwatosa Police Department that police officers use only the amount of force reasonable and necessary to arrest, apprehend or control any person, or situation.

Page 14 of 38

The decision to use force is based on the facts and circumstances known to the officer at the time the decision to use force was made.

*Id.* at 6 (quoting ECF No. 93-3 (Chief Weber declaration)).

### 3.2.1 Plaintiffs' Disputed Facts

Plaintiffs do not dispute the language of the City of Wauwatosa's policies. In their statement of disputed facts, ECF No. 103, Plaintiffs offer the following facts, or characterizations of the underlying facts.

African Americans are 30 times more likely than Caucasians to be arrested in Wauwatosa. ECF No. 103 at 2. A 2021 report commissioned by the City of Wauwatosa and published on the City's website recommended changes, *inter alia*, to the Department's racial profiling policy, its methods of tracking demographic data in arrests, and its implicit bias training. *Id.* The study noted a "significant higher number of arrests" for Black/African American people than people of other races or ethnicities. *Id.* (quoting ECF No. 102-5 at 72–73 (Center for Public Safety Management report to City of Wauwatosa)).[15] The study also concluded the number of traffic stops conducted by WPD was "an enormous amount of activity" and recommended that the number of stops be curtailed. *Id.* (quoting ECF No. 102-5 at 45). The study made similar recommendations for officer-initiated

---

[15]The full text from which Plaintiffs excerpt the quoted text reads:

When examining individuals arrested by city residency (Milwaukee, Other, and Wauwatosa) by race for the years 2017, 2018, and 2019, there was a consistent pattern of a significant higher number of arrests for Black/African American, Other, and White individuals with residency in Milwaukee, as compared to Wauwatosa or [an]other residency.

ECF No. 102-5 at 73.

Page 15 of 38

"suspicious persons" stops and noted that these stops could be construed as consistent with racial profiling. *Id.* (quoting ECF No. 102-5 at 48).

### 3.3 The Officers' Training

Training of police officers in Wisconsin is governed by state law. *Id.* at 6. Wisconsin has established the Law Enforcement Standards Board to prescribe minimum requirements for police officer training. *Id.* Officers Kaine, Vetter, Gabriel, and Dienhart have met the minimum training requirements established by the State of Wisconsin to be certified as a police officer and have maintained their respective certifications throughout their employment with the City of Wauwatosa. *Id.* Officer Kaine is not only a certified law enforcement officer, but he also is an instructor for "driving for emergency vehicle operation." *Id.* In addition, Wauwatosa trains its officers annually on legal updates. *Id.*

When asked "what in your mind is the difference between the three kinds of stops?" referencing felony stops, contact stops, and non-contact stops, Defendant Kaine testified:

> The non-contact stop is where you don't – you don't approach the vehicle, but you engage, you have the subject exit his vehicle, and you can have him stand by the rear of his car, and you can stand by your car, and you just have a conversation.
>
> Felony is a high risk stop. Generally speaking, you want to have at least four officers at the scene. You set up your cars like this angled at the suspect vehicle about 50 feet behind the suspect vehicle. That's basically the high risk stop where one officer would be giving directions to the people in the vehicle. Eventually. . . they order the subject out of the car, walk backwards towards the officers, hands in the air, order them back basically to the front of the two vehicles, and then, if you want to do a full felony stop or high risk stop, you can order them down to their knees or prone. . . to the ground. Then one

> officer would be the arresting officer. Place them in handcuffs, sit them up, bring them back.

*Id.* (quoting ECF No. 78-2 at 22-24 (Kaine deposition transcript)).

When asked "what does a high[-]risk traffic stop look like versus a non-contact traffic stop," Vetter testified:

> There are going to be more squad cars, more officers. There will probably be a much higher level of force that's obvious, meaning weapons probably will be drawn and/or pointed at that vehicle and oftentimes loud commands being given, whether that's over a PA or just being hollered out at the car and occupants involved.

*Id.* (quoting ECF No. 94-3 at 24:25–25:7 (Vetter deposition transcript)).

### 3.3.1   Plaintiffs' Disputed Facts

Plaintiffs do not dispute the training the Officer Defendants received. In their statement of disputed facts, ECF No. 103, Plaintiffs offer the following facts, or characterizations of the underlying facts.

Officer Kaine and Chief Weber could not describe the three types of car stops trained by the Wisconsin Department of Justice. ECF No. 103 at 2. The Defendants gave varying responses to what constitutes "force." *Id.* Chief Weber could not articulate the force continuum used to train his officers. *Id.* Officers Vetter and Gabriel each testified that the implicit bias training they received from the Wisconsin Department of Justice was not particularly helpful. *Id.*

Case 2:19-cv-01422-JPS   Filed 08/10/22   Page 17 of 38   Document 108

## 4. ANALYSIS

Defendants move for summary judgment[16] on the following bases. First, they argue that the undisputed facts show that Officer Kaine's actions in initiating the traffic stop and conducting the ensuing investigation had an adequate legal basis (with the applicable standard being reasonable suspicion), and that his actions are protected by qualified immunity. Relatedly, they argue that Lieutenant Vetter and Officers Dienhart and Gabriel had no personal involvement in initiating the traffic stop and therefore cannot be held liable even if the traffic stop lacked a legal basis, or if they are liable, that they are protected by qualified immunity for any constitutional infirmities in the scope of the investigation because they were entitled to rely on Officer Kaine's legal conclusions. Second, Defendants

---

[16]Defendants' opening brief also argues that Plaintiffs' complaint fails to state a claim in two regards: (1) by failing to specify which claims are alleged against which Defendants, and in what capacity, thereby failing to put Defendants fairly on notice of what conduct they are each being sued for, and (2) by failing to adequately plead an excessive force claim. ECF No. 97 at 2, 5, 12. Defendants further suggest that the Court may dispose of Plaintiffs' complaint, at least in part, under the standard for a motion to dismiss rather than the summary judgment standard. *Id.* Plaintiff counters that Defendants have waived any sufficiency-of-the-claim defense by failing to raise it in a motion pursuant to Federal Rule of Civil Procedure 12. ECF No. 104 at 3.

Neither party's position is entirely correct. Challenges to the sufficiency of a claim under Federal Rule 12(b)(6) are "expressly preserved against waiver" and may be raised in the circumstances outlined in Rule 12(h)(2): in a responsive pleading, in a motion for judgment on the pleadings, or at trial. Fed. R. Civ. P. 12 Advisory Committee's Note to 1966 Amendment. But none of the circumstances in Rule 12(h)(2) apply here. The Court therefore finds it is appropriate to address the instant motions under the summary judgment standard, and *only* the summary judgment standard. As noted in notes 1 and 3, *supra*, the Court adopts Plaintiffs' statement in their response brief that Chief Weber is named in his official capacity and Defendants' construction of the causes of action alleged in Plaintiffs' complaint.

argue that the Officer Defendants did not employ excessive force in detaining Mr. Carter, and that their actions are protected by qualified immunity. Third, Defendants argue that the City of Wauwatosa and Chief Weber cannot be held liable under *Monell* because Plaintiffs have failed to sufficiently establish that the Officer Defendants acted pursuant to a de facto municipal policy of conducting traffic stops in an unconstitutional and/or racially discriminatory way, or that their actions resulted from the City's or Weber's failure to train or supervise employees. Fourth, they move for summary judgment on all of Plaintiffs' state law constitutional claims, as not permitted by state law or precluded by sovereign immunity, and they move for summary judgment on all of Plaintiffs' common-law tort claims, as precluded by governmental immunity doctrines (and in the case of Plaintiffs' claims of intentional tort, as precluded by a lack of evidence of requisite mental state for such a claim). Fifth, they move for summary judgment on Plaintiffs' request for punitive damages, on the basis that Plaintiffs have failed to show the requisite mental state to recover such damages. Sixth, they move for summary judgment on Plaintiffs' request for injunctive relief, on the basis that Plaintiffs lack standing for such relief.

Plaintiffs move for partial summary judgment as follows. First, they argue that the undisputed facts show that Officer Kaine's actions in initiating the traffic stop and conducting the ensuing investigation lacked an adequate legal basis (with the applicable standard being probable cause), and that his actions are not protected by qualified immunity. Relatedly, they argue Lieutenant Vetter is liable for failure to intervene in a traffic stop he believed lacked an adequate basis in law. Second, they argue that the

Officer Defendants employed excessive force in detaining Mr. Carter and are not protected by qualified immunity.

The Court addresses each of these sets of arguments in turn.

### 4.1    Defendants' Traffic Stop of Plaintiffs

As a threshold matter, Plaintiffs suggest the Court should find that the traffic stop of Plaintiffs' vehicle was a full custodial arrest, rather than a brief investigative stop pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968). ECF No. 100 at 13–17. Consequently, Plaintiffs argue that the Court may apply the probable cause standard to assess Defendants' actions for purposes of summary judgment. *Id.* However, the parties argue the *Terry* reasonable suspicion standard in their submissions on Defendants' motion for summary judgment, and Plaintiffs in their cross-motion concede that "the Court need not reach" a determination about the nature of the stop. *Id.* at 13. Considering this, the Court will conduct its analysis under the reasonable suspicion standard. In any event, significant disputes of material fact and credibility preclude the Court from granting summary judgment to Defendants under the reasonable suspicion standard—so, by extension, summary judgment could not be granted to Plaintiffs under a probable cause standard either. *See United States v. Raibley*, 243 F.3d 1069, 1074 (7th Cir. 2001) (comparing the reasonable suspicion and probable cause standards).

#### 4.1.1   Basis for the Stop

Police officers may not perform investigatory stops of individuals without a reasonable, articulable suspicion that criminal activity has occurred or is afoot, as judged by an objective inquiry into all the circumstances the officer knows at the time of the stop. *See Huff v. Reichert*,

Page 20 of 38

744 F.3d 999, 1004 (7th Cir. 2014); *United States v. Snow*, 656 F.3d 498, 500 (7th Cir. 2011); *Smith v. Ball State Univ.*, 295 F.3d 763, 768 (7th Cir. 2002) ("[T]he legitimacy of a *Terry* stop depends upon an officer's ability to produce articulable facts giving rise to a reasonable suspicion that a defendant has been, is, or is about to be engaged in criminal activity.") (internal citations omitted). Reasonable suspicion requires more than a "hunch" of criminal activity. *Matz v. Kotka*, 769 F.3d 517, 522 (7th Cir. 2014).

Reasonable suspicion for an investigative stop may be based on "information supplied by another person," not just a police officer's personal observation. *Adams v. Williams*, 407 U.S. 143, 147 (1972). This includes anonymous tips. *Alabama v. White*, 496 U.S. 325, 327 (1990). An anonymous tip alone, without more, is not sufficient to justify a police officer's investigatory stop. *Florida v. J.L*, 529 U.S. 266, 266 (2000). But an anonymous tip may provide an adequate legal basis for an officer's investigative stop when the tip "exhibit[s] sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop." *White*, 496 U.S. at 327.

In assessing the indicators of reliability of an anonymous tip, courts look to whether "the tipster (1) asserts eyewitness knowledge of the reported event; (2) reports contemporaneously with the event; and (3) uses the 911 emergency system, which permits call tracing." *United States v. Watson*, 900 F.3d 892, 895 (7th Cir. 2018) (citing and distinguishing *Navarette v. California*, 572 U.S. 373, 400–01 (2014)). An anonymous tip that contemporaneously describes an "ongoing emergency," as opposed to describing "general criminality," may evince sufficient reliability to support that an officer had reasonable suspicion to act on it, provided the

anonymous tip otherwise "allow[s] the police to test the informant's credibility." *United States v. Hicks*, 531 F.3d 555, 558–59 (7th Cir. 2008). An anonymous tip must be "reliable in its assertion of illegality, not just in its tendency to identify a determinate person." *Florida v. J.L.*, 529 U.S. at 271–72 (finding anonymous tip did not support reasonable suspicion because tipster did not "explain[] how he knew about the gun nor suppl[y] any basis for believing he had inside information about" the suspect he named).

The validity of Officer Kaine's decision to initiate a traffic stop of Plaintiffs' vehicle hinges on whether the tip bore sufficient indicia of reliability such that Officer Kaine was justified in relying on it.[17] The answer to this question depends on the resolution of factual disputes and credibility determinations. The Court is not authorized to resolve either as a matter of law, and therefore is obliged to deny summary judgment so that these disputes and determinations may be submitted to a jury.

First, the parties dispute how to characterize Mr. Anderson's tip to Officer Kaine, and indeed whether it was ever given at all. Defendants argue that the tip was not anonymous because, although Mr. Anderson did not provide his name, "Officer Kaine saw him, his vehicle, and observed his demeanor." ECF No. 97 at 7. This, they appear to argue (though they cite no case on point), makes the tip akin to a 911 call, which should be enough to get around the heavy emphasis that *Navarette* places on an anonymous tipster's use of the 911 system in assessing indicia of reliability.

---

[17]Since it is undisputed that Officer Kaine did not himself witness the blue Lexus in which Plaintiffs were traveling commit any traffic violation or see the occupants of the Lexus make any "furtive" movements, the validity of the traffic stop depends entirely on whether the alleged anonymous tip was reliable enough to establish that Officer Kaine had reasonable suspicion to initiate it.

Plaintiffs (although they stipulate to Mr. Anderson's and Officer Kaine's statements in their depositions) dispute whether Mr. Anderson ever reported a tip to Officer Kaine at all. ECF Nos. 100 at 13 and 104 at 5–6. Further, Plaintiffs point out that when Mr. Anderson allegedly pulled his vehicle up next to Officer Kaine's squad car to relay his tip, Officer Kaine "does not get one single letter or digit of the license plate," "does nothing to document the conversation," and despite "the ability to manually turn on his front and rear squad cams," does not "record anything from this encounter." ECF No. 104 at 6–7. Plaintiffs, in other words, seemingly call on the Court to recognize the lack of any recording of or an effort to record the interaction (which would have occurred had the tip been given via the 911 system) as weighing more heavily against the tip's reliability.

The question of whether a tip was indeed an anonymous tip received within the 911 emergency system context, for purposes of assessing its reliability, has been found to present a factual dispute that precluded summary judgment. *Beal v. Beller*, 847 F.3d 897, 904–05 (7th Cir. 2017). In *Beal,* the plaintiff was stopped pursuant to an anonymous tip, subjected to a search that revealed drugs, and then prosecuted for drug possession. *Id.* at 899. His prosecution was dismissed after he prevailed on a motion to suppress the drugs, and he then brought a § 1983 action against the apprehending detectives' initial search. *Id.* at 900. The Seventh Circuit reversed the district court's grant of summary judgment to the detectives, due to fact disputes surrounding how the anonymous tip that led to the plaintiff's arrest was made, which dictated how the reliability of the tip should have been evaluated. *Id.* at 904–05. In doing so, the Seventh Circuit pointed out that *Navarette v. California*'s reasoning that an officer may

justifiably rely on an anonymous tip when (in combination with other factors) the tipster makes their report to the 911 emergency system, applies where the anonymous tip was *actually made* to the 911 system. *Id.* Where there is a factual dispute over whether the 911 system's "features that allow for identifying and tracing callers, and thus provide some safeguards against making false reports with immunity," *Navarette*, 573 U.S. at 400, were present in the reporting of the tip, a district court cannot rule on the tip's indicia of reliability as a matter of law. *Beal* at 905; *see also Watson*, 900 F.3d at 895 (finding reasonable suspicion did not exist partially because tipster used a stranger's phone to dial 911, therefore "*Navarette*'s rationale for deeming 911 calls reliable ha[d] less force").

The same logic applies here. To adopt Defendants' position, the Court would have to accept that a face-to-face, anonymous, unrecorded tip is perfectly analogous—as a matter of law—to an anonymous call placed to the 911 emergency system. The Court cannot do so, given that *Navarette*'s 911 traceability rationale is not present here. The Court would also have to find that the face-to-face, anonymous, unrecorded tip occurred, which the Court cannot do in a summary judgment posture, considering Plaintiffs' dispute of this key fact (and, as discussed below, the credibility determinations required to assess whether the tip provided a valid legal basis for the traffic stop).

Even setting aside this factor in the analysis, further fact and credibility disputes preclude summary judgment on the question of whether Mr. Anderson's tip bore sufficiency indicia of reliability to permit Officer Kaine to rely on it in stopping Plaintiffs. While it is true that Mr. Anderson's tip "asserts eyewitness knowledge of the reported event,"

*Watson*, 900 F.3d at 895, it is unclear whether it purports to describe an "ongoing emergency," *Hicks*, 531 F.3d at 558.

Mr. Anderson has stated that, when he gave the tip, he told Officer Kaine he believed there may be a gun involved in the supposed robbery, based on what he saw occurring inside the blue Lexus from his vantage point. Aside from his perception of a gun in the vehicle, Mr. Anderson did not otherwise specify what information persuaded him that there was a robbery occurring (at least according to the parties' fact statements)—for example, whether the people inside the blue Lexus looked distressed or whether the driver was driving erratically as if being threatened by a weapon. For his part, Officer Kaine has not stated whether Mr. Anderson ever told him about a gun when giving the tip. Officer Kaine did not mention a possible gun or armed suspect in any of his communications with dispatch or the other officers; he only made conclusory statements about "a possible robbery."

The difference between how Mr. Anderson recalled giving the tip, and how Officer Kaine relayed the tip to others and recalled it in his deposition, points to a significant dispute of material fact: what did Officer Kaine know after he spoke with Mr. Anderson? *See Huff*, 744 F.3d at 1004 (assessing reasonable suspicion requires objective examination of the circumstances the officer *knows* at the time of the stop). On the facts now before the Court, it is unclear what part(s) of Mr. Anderson's statements Officer Kaine knew when he stopped Plaintiffs—this is a jury question.

This question also puts Officer Kaine's and Mr. Anderson's credibility in play. While Mr. Anderson does "explain[] how he knew about the gun," *Florida v. J.L.*, 529 U.S. at 271–72, whether Officer Kaine was

justified in relying on Mr. Anderson's supposed knowledge relies at least in part on whether the factfinder is persuaded that Mr. Anderson accurately perceived whatever was occurring inside the blue Lexus. Officer Kaine's credibility, insofar as whether he accurately perceived Mr. Anderson's tip, is also for the jury to determine (considering, for example, that Officer Kaine recounted Mr. Anderson's tip as to the racial and gender makeup of the occupants of the vehicle differently before the stop versus after).

Even if the jury finds Mr. Anderson's statement about seeing a gun in the blue Lexus credible and finds that Officer Kaine both accurately perceived and knew of the statement, Mr. Anderson's tip might still not have described criminal activity in progress or an "ongoing emergency." *Hicks*, 531 F.3d at 558. In *United States v. Watson*, the Seventh Circuit distinguished 911 calls that "report[] conduct that the officers reasonably suspected to be criminal," such as the caller in *Navarette* being run off the road by a truck, from calls that raise the mere possibility of unlawful possession or use of a gun where it is otherwise legal to do so. *Watson*, 900 F.3d at 895–96. Wisconsin law permits a person to carry a firearm in their vehicle under certain circumstances. *See* Wis. Stat. §§ 167.31(2)(b)–(c). Even if a jury credited Mr. Anderson's and Officer Kaine's accounts, the jury would still need to decide whether their allegations support a reasonable suspicion that the firearm in the blue Lexus was being used unlawfully.

These disputed facts and credibility determinations are material, and thus preclude summary judgment. These issues are for the factfinder to resolve. *See Beal*, 847 F.3d at 905.

Defendants next argue that, even if Plaintiffs establish a constitutional violation, Officer Kaine is nonetheless shielded by qualified

immunity. Plaintiffs argue for a finding to the contrary. The qualified immunity doctrine protects government officials from civil liability when they perform discretionary functions "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

To determine the applicability of qualified immunity at the summary judgment stage, a court must engage in a two-part analysis to determine whether (1) the facts, viewed in the light most favorable to the non-movant, establish the violation of a constitutional right, and (2) the constitutional right at issue was "clearly established" at the time of the official's purportedly illegitimate conduct. *Leiser v. Kloth*, 933 F.3d 696, 701 (7th Cir. 2019). A right is clearly established when its contours are "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (internal quotations and alterations omitted). Courts should "not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al–Kidd*, 563 U.S. 731, 741 (2011).

Viewing the facts in the light most favorable to Plaintiffs, the Court finds that Plaintiffs have established a potential violation of their Fourth Amendment right to be free from traffic stops (or arrests) that are not supported by a sufficient legal basis. This right appears to be[18] clearly

---

[18]The Court notes that "[t]he plaintiff bears the burden of establishing the existence of a clearly established constitutional right." *Kernats v. O'Sullivan*, 35 F.3d

Page 27 of 38

established. *Compare United States v. Packer*, 15 F.3d 654, 659 (7th Cir. 1994) (no reasonable suspicion where citizen tip on which police acted described suspects' behavior as "suspicious" but otherwise lacked "minimal detail of information that would point to any arguably particularized suspicion of criminal conduct") *and Gentry v. Sevier*, 597 F.3d 838, 843, 846 (7th Cir. 2010) (no reasonable suspicion where dispatch report on which police acted reported activity that was not, in itself, a crime) *with Green v. Newport*, 868 F.3d 629, 634 (7th Cir. 2017) (officer had reasonable suspicion for *Terry* stop where tip on which officer relied matched suspect's vehicle, officer observed behavior consistent with casing a business before a robbery, and suspected robbery was occurring at a place that had previously been robbed).

Although the right is clearly established, the application of qualified immunity in this case remains unclear. While disputed material fact issues and credibility determinations remain as to whether Officer Kaine had reasonable suspicion of the alleged robbery, the Court cannot find that he is protected by qualified immunity as to the initiation of the traffic stop. *See Koh v. Ustich*, 933 F.3d 836, 838 (7th Cir. 2019) (dismissing interlocutory appeal on question of qualified immunity for lack of jurisdiction where appellant's arguments were "inseparable from the questions of fact identified by the district court").

### 4.1.2   Scope of the Ensuing Investigation

Defendants preemptively move against Plaintiffs' claim that the scope or duration of Officer Kaine's investigation after he pulled over

---

1171, 1176 (7th Cir. 1994). Across two briefs, Plaintiffs offer only a single case that is not on point. ECF Nos. 100 at 23–24 and 104 at 13–14.

Plaintiffs violated the Fourth Amendment. ECF No. 97 at 7. Here, summary judgment is precluded as well.

"For an investigative stop based on reasonable suspicion to pass constitutional muster, the investigation following it must be reasonably related in scope and duration to the circumstances that justified the stop in the first instance so that it is a minimal intrusion on the individual's Fourth Amendment interests." *United States v. Robinson*, 30 F.3d 774, 784 (7th Cir. 1994). Of course, this rule presupposes that "the circumstances that justified the stop in the first instance" amount to a valid legal basis for conducting the stop. *See United States v. Bullock*, 632 F.3d 1004, 1016–18 (finding "officers [who] acted diligently . . . to investigate their well-founded suspicions of [suspect's] criminal activity" did not unduly prolong a *Terry* investigative detention).

Defendants invite the Court to proceed directly to determining whether the conditions of Mr. Carter's brief detention were appropriate. However, unresolved factual and credibility disputes drive whether Officer Kaine's suspicions of criminal activity occurring in Plaintiffs' vehicle were "well-founded." *Bullock*, 632 F.3d at 1018. Without a clearer picture of what Officer Kaine was detaining Plaintiffs *for*, the Court also cannot rule definitively on whether the conditions of the ensuing investigation exceeded the factual basis that initially justified the traffic stop. Similarly, the Court will not yet wade into whether Officer Kaine is protected by qualified immunity as to the scope and duration of the investigatory stop.

### 4.1.3   Other Officers' Involvement

Defendants argue that, to the extent Plaintiffs name Lieutenant Vetter and Officers Dienhart and Gabriel as responsible for their claim that

Page 29 of 38

the initial stop lacked reasonable suspicion, these officers had no personal involvement and cannot be held liable for initiation of the stop. ECF No. 97 at 4. The Court concurs in this point. *See Starzenski v. City of Elkhart*, 87 F.3d 872, 880 (7th Cir. 1996) (quoting *Schultz v. Baumgart*, 738 F.2d 231, 238 (7th Cir. 1984) ("Liability under § 1983 must be 'predicated upon personal responsibility.'")).

Defendants further ask the Court to hold, as a matter of law, that Lieutenant Vetter and Officers Dienhart and Gabriel are entitled to qualified immunity for any constitutional violations that may have arisen in the scope and duration of the investigation pursuant to the stop, because they were entitled to "reasonably rely on Officer Kaine's legal conclusions." ECF No. 97 at 10–12. In *Duran v. Sirgedas*, the Seventh Circuit affirmed that certain officers had qualified immunity when they acted in reliance on other officers' statements and conduct (for example, another officer's statement that he "wanted [the suspect] arrested") as demonstrating there was probable cause for their actions. 240 Fed. App'x. 104, 114–16 (7th Cir. 2006). Here, each officer attributed to Officer Kaine a different legal conclusion on which they relied. *Id.* ("Lieutenant Vetter . . . believed he was responding to an in-progress vehicle robbery"; "Officer Dienhart believed he was responding to a high-risk traffic stop"; "Officer Gabriel believed she was responding to a robbery[.]") Whether each of these differing beliefs was reasonable, in light of the limited information they received from radio dispatch and the information that was apparent to them when they showed up on scene, is a question of credibility for the trier of fact. Neither summary judgment nor a finding of qualified immunity is appropriate on this point at this juncture.

Plaintiffs move for a finding on summary judgment that Lieutenant Vetter, specifically, knew or believed Officer Kaine's traffic stop lacked a viable basis in law, yet failed to intervene to end the stop, and is therefore liable for resulting constitutional violations. *See Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994). A failure to intervene presupposes a constitutional violation, which due to the factual disputes outlined above, cannot be determined on the present facts in a motion for summary judgment.

### 4.2 Plaintiffs' Excessive Force Claim

The Court cannot grant summary judgment for either party on whether the Officer Defendants used excessive force in detaining Plaintiffs. The parties primarily debate whether the unholstering or drawing of officers' service weapons, and the pointing of weapons in the direction of Plaintiffs' vehicle, constitutes excessive force under these circumstances. ECF Nos. 97 at 12–16 and 100 at 17–19. However, the disputed material facts and credibility determinations described *supra* in Section 4.1.1 bear on whether Officer Kaine had the requisite reasonable suspicion of the alleged (possibly armed) robbery to justify the use of service weapons in the ensuing investigation.

"[A]ll claims that law enforcement officers have used excessive force . . . should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 395 (1989). "The reasonableness inquiry is an objective one, examining 'whether the officer's actions are objectively reasonable in light of the totality of the facts and circumstances confronting him or her, without regard for consideration of the officer's subjective intent or motivations." *Payne v. Stacy*, Case No. 18-CV-850, 2020 WL 886185, at *3 (E.D. Wis. Feb. 24, 2020), *appeal dismissed*,

Case No. 20-1509, 2020 WL 5793102 (7th Cir. June 12, 2020) (quoting *Estate of Williams v. Ind. State Police Dep't*, 797 F.3d 468, 473 (7th Cir. 2015)). The actions taken by an officer "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396 (citing *Terry*, 392 U.S. at 20–22). "In the end, the excessive force inquiry 'looks to whether the force used to seize the suspect was excessive in relation to the danger he posed—to the community or to the arresting officers—if left unattended.'" *Jacobs v. City of Chicago*, 215 F.3d 758, 773 (7th Cir. 2000) (quoting *McDonald v. Haskins*, 966 F.2d 292, 294 (7th Cir. 1992).

Without resolution on whether Officer Kaine had reasonable suspicion to conduct the initial traffic stop—which informs what "danger," if any, Kaine believed he was responding to—the Court cannot determine whether it was appropriate for any of the Defendants to engage in the kind of investigatory stop that might allow for the use of force under WPD policy and constitutional standards. *See Jacobs*, 215 F.3d at 773 (finding excessive force where officers executed a seizure without probable cause to suspect a crime had occurred).

Accordingly, the excessive force analysis collapses into whether Officer Kaine had reasonable suspicion that a robbery was occurring in the blue Lexus. As the Court has already determined, the material facts underlying reasonable suspicion are in dispute and require the factfinder to conduct credibility determinations. Once the factfinder determines whether Officer Kaine had reasonable suspicion to conduct the traffic stop, the factfinder may determine whether the drawing of weapons was either a reasonable or excessive use of force.

Defendants again argue that even if the force used was excessive, Officer Kaine and the rest of the Officer Defendants are protected by qualified immunity. At this juncture, when disputed material fact issues and credibility determinations exist as to whether Officer Kaine had reasonable suspicion, the Court cannot find that he is protected by qualified immunity as to the drawing of service weapons. *See Clash v. Beatty*, 77 F.3d 1045, 1048 (7th Cir. 1996) ("[I]f the facts draw into question the objective reasonableness of the police action under the alleged circumstances, they must be developed in the district court before a definitive ruling on the defense can be made.") Similarly, as discussed in section 4.1.3 *supra*, the extent to which the other three Officer Defendants reasonably relied on Officer Kaine's legal conclusions is for the trier of fact to decide, so their entitlement to qualified immunity is also left open.

As above, Plaintiffs move for a finding on summary judgment that Lieutenant Vetter, specifically, knew or believed Officer Kaine's traffic stop lacked a viable basis in law, yet failed to intervene to prevent excessive force from occurring, and is therefore liable for resulting constitutional violations. *See Yang*, 37 F.3d at 285. This cannot be determined on the present facts in a motion for summary judgment.

### 4.3 *Monell* Liability

Plaintiffs also sue the City of Wauwatosa, arguing it is liable under *Monell* for the alleged Fourth Amendment violations due to a de facto policy to allow, and/or a failure to train, discipline, and supervise WPD employees to avoid, racial profiling or constitutional violations in WPD-administered traffic stops. Defendants move for summary judgment in

their favor on this question, but factual disputes again preclude the Court from granting their motion.

As a threshold matter, without a determination of whether any underlying constitutional violation occurred, the Court cannot say one way or another whether the City of Wauwatosa can be liable for it. *See City of Los Angeles v. Heller*, 475 U.S. 796, 798–99 (1986) ("[I]f [the officer] inflicted no constitutional injury on respondent, it is inconceivable that petitioners could be liable to respondent."); *see also Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 305 (7th Cir. 2010) ("[A] municipality can be held liable under *Monell*, even when its officers are not, unless such a finding would create an *inconsistent* verdict.").

"[L]ocal governments . . . may be sued for constitutional deprivations visited pursuant to governmental 'custom' 'even though such a custom has not received formal approval through the body's official decisionmaking channels." *Monell*, 436 U.S. at 690–91. Liability may attach "if the unconstitutional act complained of is caused by . . . a governmental practice or custom that, although not officially authorized, is widespread and well settled." *Thomas*, 604 F.3d at 303. There is no bright-line rule defining what constitutes a "widespread" custom, policy, or practice, but "the plaintiff must demonstrate that there is a policy at issue rather than a random event." *Id.* The plaintiff must also demonstrate that municipal policymakers were "aware of the risk created by the custom or practice and . . . failed to take appropriate steps to protect the plaintiff." *Id.* Similarly, "an inadequacy in police training can serve as a basis for liability under Section 1983, but only where the failure to train amounts to deliberate indifference to the citizens the officers encounter." *Matthews v. City of E. St. Louis*, 675

F.3d 703, 709 (7th Cir. 2012). "Beyond these threshold requirements, the jury must make a factual determination as to whether the evidence demonstrates that the [municipality] had a widespread practice that [resulted in] the alleged constitutional harm." *Thomas*, 604 F.3d at 303.

Defendants argue that Plaintiffs have not marshaled sufficient evidence to demonstrate the existence of a widespread city policy or practice. Plaintiffs counter by referring, in their statement of disputed facts, to a report issued to the City of Wauwatosa recommending that the City address WPD's arrest rates of Black and African American individuals, rates of traffic stops, and rates of officer-initiated "suspicious persons" stops, ECF No. 102-5, and to a news article detailing the disproportionate rates of arrests of Black individuals by the WPD, ECF No. 102-1. Plaintiffs' allegations, while threadbare, do enough to at least call into question whether Officer Kaine's decision to stop Plaintiffs' vehicle was completely random (and not pursuant to a de facto custom or policy), and whether Wauwatosa policymakers knew that officers such as Officer Kaine might be engaging in such practices. The final factual determinations on these issues are for the jury.

Absent a determination of whether any underlying constitutional violation occurred, and absent a determination of whether the City of Wauwatosa had a widespread custom or practice of condoning the kind of traffic stop Officer Kaine engaged in, the Court may not grant summary judgment on this question.

### 4.4    State Law Claims

Defendants move for summary judgment on Plaintiffs' claims under the Wisconsin Constitution on the basis that the state constitution does not

authorize suits for money damages in this context, and that Plaintiffs' request for injunctive relief (to the extent they have standing to bring it, *see* 4.6 *infra*) is barred by state sovereign immunity and federalism principles. ECF No. 97 at 22. Plaintiffs do not seek summary judgment on their state constitutional claims.

Similarly, Defendants move for summary judgment on Plaintiffs' remaining tort claims on the basis that Wisconsin's governmental immunity statute would shield Defendants from liability for acts performed in the exercise of discretion and judgment. *Id.* at 23–26. Defendants also argue that Defendants lacked the requisite state of mind to prove an intentional infliction of emotional distress claim. *Id.* at 27. Plaintiffs do not move for summary judgment on their tort claims.

The Court declines to determine how to apply Wisconsin state law to these Defendants until the underlying factual dispute as to liability for alleged federal law violations is resolved. The Court will therefore not grant summary judgment to Defendants on these questions at this time.

### 4.5    Punitive Damages

Defendants move for summary judgment on the question of whether, in the event Defendants are found liable, Plaintiffs are entitled to recover punitive damages. *Id.* at 28. Specifically, they argue (1) that punitive damages are not recoverable in Section 1983 suits against municipal defendants or officials sued in their official capacity, and (2) that the evidence does not support a finding that the Officer Defendants had the requisite state of mind for punitive damages to be available. *Id.* Plaintiffs do not seek summary judgment on this question.

The Court declines to address what, if any, damages are recoverable in this matter until the underlying factual dispute as to liability for alleged federal law violations is resolved. The Court, therefore, will not grant summary judgment to Defendants on this question at this time.

### 4.6 Equitable Relief

Plaintiffs in their complaint seek "declaratory, injunctive, and other equitable relief, reforming the Defendant City of Wauwatosa policies, practices, and procedures to prevent like actions and harms in the future." ECF No. 1-2 at 21. Defendants argue that these claims should be dismissed for lack of standing. ECF No. 97 at 28. Plaintiffs do not seek summary judgment on this question, but in their response to Defendants' motion, counter that they are likely to travel through Wauwatosa again and that injunctive relief would enable them to do so without interference from Defendants. ECF No. 104 at 4. Without clarity on whether the underlying alleged constitutional violation occurred, the Court cannot decide the appropriateness of injunctive relief against any prospective violations. The Court will therefore not grant summary judgment to Defendants on this question at this time.

### 5. CONCLUSION

Because this case presents significant disputes of material fact and credibility determinations that must be resolved by a jury—and many corollary legal questions that can only be resolved once the underlying factual issues are resolved—the Court denies the parties' cross-motions for summary judgment.

Accordingly,

**IT IS ORDERED** that Defendants' motion for summary judgment, ECF No. 95, be and the same is hereby **DENIED**;

**IT IS FURTHER ORDERED** that Plaintiffs' amended motion for summary judgment, ECF No. 100, be and the same is hereby **DENIED;**

**IT IS FURTHER ORDERED** that Defendants John Does 1–3 and Jane Does 1–3 be and the same are hereby **DISMISSED** from this action; and

**IT IS FURTHER ORDERED** that James MacGillis be substituted as a Defendant for Barry Weber.

Dated at Milwaukee, Wisconsin, this 10th day of August, 2022.

BY THE COURT:

_____

J. P. Stadtmueller
U.S. District Judge